EVA BERKOWITZ, Also Known as EVE BERKOWITZ, Appellant, v. NEW YORK LIFE INSURANCE COMPANY, Respondent.

First Department, March 3, 1939.

*Gilbert Goldstein* of counsel [*David Goldstein* with him on the brief; *Goldstein & Goldstein*, attorneys], for the appellant.

*Kenneth deF. Carpenter* of counsel [*Louis H. Cooke*, attorney], for the respondent.

CALLAHAN, J. This action is brought to recover double indemnity under a life insurance policy. The policy provided for payment of double the face thereof " upon receipt of due proof that the death of the insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental cause, and that such death occurred within sixty days after sustaining such injury."

There was an exception from coverage in the policy to the effect that the double indemnity benefit would not apply if death resulted "from physical or mental infirmity; or directly or indirectly from illness or disease of any kind."

The insured was suffering from syphilis. He was receiving medical treatment which consisted of alternate hypodermic injections of bismuth and neo-salvarsan. Death resulted from a violent reaction from the fifth injection of the neo-salvarsan. The last dose was administered about a month after the first. The quantity injected had commenced with three-tenths of a gram, and was gradually increased to six-tenths of a gram, and had been administered in the customary manner and without untoward incident. The use of the drug was the recognized standard treatment for the disease. It was said to be the cautious way of treating the disease.

Physicians called as plaintiff's witnesses testified that unfavorable reaction to injections of neo-salvarsan occurred very rarely; that the average risk of death was about one in seven thousand to eleven thousand instances. They stated that an unfavorable reaction to the drug is always a possibility and that in the rare number of cases indicated persons are found upon whom the drug acts unfavorably. They stated that medical science had no way of detecting which patient would be hyper-susceptible to the drug.

The physicians also swore that the existence of a syphilitic condition in no way contributed to the insured's death, though it was because of the presence of that disease that the drug was administered. They stated that if the insured had received the drug for any other reason he would have died from it. Because of the circumstance that in the very rare number of cases indicated reactions are unfavorable, the treatment is started with small doses. Here the dose being administered was still small. It was termed by one of the physicians as an " infantile dose."

The doctors said that the drug, in the exceptional instances where it was harmful, acted on the patient in such a way as to cause toxicity to his system, with the breaking out of the skin in leaf-like eruptions, known medically as dermatitis exfoliativa. That condition developed in the insured in this case after the fifth injection, with fatal results within sixty days. The doctors stated that death resulted directly and solely because of the treatment received.

The defendant rested on plaintiff's case, and the trial court directed a verdict for the defendant. Two questions are presented by the appeal: (1) whether there was evidence to establish *prima facie* that the death was accidental, and (2) whether death resulted

from accident, independently of other causes, and not from an infirmity, or directly or indirectly from a disease.

We think that it is clear that death resulted from an accident within the meaning of this policy.

It has been held that if a fatal infection results from the use of a hypodermic needle, the case is one of accidental death within the meaning of a similar insurance policy. (*Lewis* v. *Ocean Accident & G. Corp.*, 224 N. Y. 18.) Nor would the fact that the insured herein intentionally incurred the administration of the drug preclude a finding that death occurred through accidental means. (*Mansbacher* v. *Prudential Ins. Co.*, 247 App. Div. 378; affd., 273 N. Y. 140; *Gallagher* v. *Fidelity & Casualty Co.*, 163 App. Div. 556; affd., 221 N. Y. 664.)

Here the hypodermic needle did not introduce a germ or other foreign substance which causes infection, but introduced merely the drug sought to be injected. Death, however, occurred from the extremely rare circumstance that the insured had some physical peculiarity that made him hyper-susceptible to the drug used.

An accident is defined by a leading authority on insurance as " An event which takes place without one's foresight or expectation, and which proceeds from an unknown cause or an unusual effect of a known cause not within the expectation of the person injured." (Richards on Insurance Law [3d ed.], 385.) " Accidental means " has been defined as follows: " Accidental means are those which product effects which are not their natural and probable consequences." (4 Cooley on Insurance, 3156.) These definitions have received the approval of our courts. (*Gallagher* v. *Fidelity & Casualty Co.*, supra.)

The meaning of the word " accident," as used in life insurance policies, is that which would be given it by the average man. (*Lewis* v. *Ocean Accident & G. Corp.*, supra.) In that case the court said: " Such a man would say that the dire result, so tragically out of proportion to its trivial cause, was something unforeseen, unexpected, extraordinary, an unlooked-for mishap, and so an accident."

In *Mansbacher* v. *Prudential Ins. Co.* (supra) the insured died from taking an overdose of veronal. He had been suffering from an earache. He had previously taken veronal for a similar ailment. On the occasion of taking the fatal dose the evidence disclosed that he had no intention of committing suicide, but apparently a lethal dose had been taken by mistake. It was held that death was from accidental means.

We need not repeat lengthy quotations from the decisions of the courts of this State concerning the construction to be given to words of similar import to those contained in the policy herein.

In an insurance policy the words are to be judged in the light of the understanding of the average man who procures such a policy. We consider that such a man would deem that a result that occurred only once in seven thousand to eleven thousand cases, and that could not be foretold, was an accident. In fact, the respondent does not appear to stress this point to sustain the judgment, but relies largely on the answer which it asserts must be given to the second branch of our inquiry. It states that even if this occurrence was an accident, death resulted from an infirmity, or, at least, indirectly from a disease.

In determining this question, we think that the answer depends on whether the idiosyncracy that made neo-salvarsan dangerous to the insured may be considered an infirmity or a disease, as those terms are understood by the average man.

The insured did not die of syphilis. According to the testimony that disease was not an active factor in his death. No other disease is mentioned by any one in the case, except the condition of dermatitis exfoliativa which was the medical term for the poison which resulted from the injection of the drug. This, however, was solely the result of the accident.

Unless, then, the predisposition to unfavorable results from the receipt of neo-salvarsan is an infirmity or disease, we can find no proof in the record that the insured's death was brought about directly or indirectly by any such factor. The burden was on the plaintiff to establish that this predisposition was not an infirmity or disease. We think that, on the proof, the issue on that question was for the jury.

In *McMartin* v. *Fidelity & Casualty Company* (264 N. Y. 220) the insured met with an automobile accident, suffering an injury to his chest with resulting shock. He had had chronic nephritis for three years and also serious chronic intestinal ailments. The shock of the accident brought increased trouble in his urinal and intestinal tracts, causing an absorption of poison, with resulting death from nephritis. Plaintiff's claim was that the accident alone killed the insured, because he was unable to withstand the shock thereof. The Court of Appeals held that plaintiff had failed to prove that death resulted from accidental injury independent of other causes. It said (at p. 223): " The burden was on plaintiff to show that the idiosyncratic condition of McMartin's body, upon which the accidental injury impinged ultimately to cause death, was not a disease within the meaning of the established rule. The burden was not met. Nephritis existent for at least three years, chronic and progressive, may not with any fitness of language or with any sense of reality be described as a mere predisposing

tendency. It is a condition which in its natural and probable development may be expected to be a source of mischief, and so a disease; and if it were mentioned as inflammation of the kidneys instead of nephritis, the ordinary man in his common speech would unquestionably call it a disease."

In *Silverstein* v. *Metropolitan Life Insurance Co.* (254 N. Y. 81) the insured fell while lifting a milk can which struck his abdomen. A perforation occurred in his intestines at a point where there was a small duodenal ulcer. The existence of this ulcer was unknown. It was dormant and would have had no effect were it not for the blow, though the wall of the intestine was weakened to some degree at the point. The court held that the death which followed the accident was exclusively the result of the accident. The ulcer was found not to be a disease or infirmity within the meaning of a policy which had provisions similar to ours. The court there said:

" We think the evidence sustains a finding that the ulcer was not a disease or an infirmity within the meaning of the policy. Left to itself, it would have been as harmless as a pimple or a tiny scratch. Only in the event that it was progressive would it become a source of pain or trouble. If dormant, as it was found to be, it was not only harmless in itself, but incapable of becoming harmful except through catastrophic causes, not commonly to be expected. In a strict or literal sense, any departure from an ideal or perfect norm of health is a disease or an infirmity. Something more, however, must be shown to exclude the effects of accident from the coverage of a policy. The disease or the infirmity must be so considerable or significant that it would be characterized as disease or infirmity in the common speech of men. (*Eastern Dist. Piece Dye Works* v. *Travelers Ins. Co.*, 234 N. Y. 441, 453.) * * *

" A distinction, then, is to be drawn between a morbid or abnormal condition of such quality or degree that in its natural and probable development it may be expected to be a source of mischief, in which event it may fairly be described as a disease or an infirmity, and a condition abnormal or unsound when tested by a standard of perfection, yet so remote in its potential mischief that common speech would call it not disease or infirmity, but at most a predisposing tendency. (*Leland* v. *Order of U. C. Travelers*, 233 Mass. 558, 564; *Collins* v. *Casualty Co.*, 224 Mass. 327; *Mutual Life Ins. Co.* v. *Dodge*, 11 Fed. Rep. [2d] 486; cert. denied, 271 U. S. 677; *Taylor* v. *N. Y. Life Ins. Co.*, 176 Minn. 171, 174.) The governing principle has been stated by RUGG, C. J., with clearness and precision: ' If there is no active disease, but merely a frail general condition, so that powers of resistance are easily overcome, or merely a tendency to disease which is started up and

made operative, whereby death results, then there may be recovery even though the accident would not have caused that effect upon a healthy person in a normal state.' (*Leland* v. *U. C. Travelers, supra,* at p. 564.) "

Though we do not have in this case the benefit of expert medical testimony attempting to describe what a predisposition or idiosyncracy to injury from a drug is considered in the science of medicine, it sufficiently appears in the case that it is something that cannot be detected and rarely occurs.

In the light of the foregoing authorities we consider that it is the settled law of our State that such a mere predisposing tendency cannot be held as a matter of law to be an infirmity or disease.

A similar holding is found in *Mutual Life Ins. Co.* v. *Dodge* (11 F. [2d] 486; cert. denied, 271 U. S. 677.) There the action involved a policy which contained a clause quite identical with the present one. The insured died from an injection of novocaine taken preparatory to a tonsil operation. He had no physical infirmity or disease other than a tender throat. The trial court instructed the jury that if it found that the natural and probable result from the injection of novocaine was to induce anæsthesia without injury, and that by reason of a bodily idiosyncracy of the insured, whereby he was unusually susceptible to the drug, which susceptibility was unforeseen and unexpected, and the action of the drug was to produce death, then a verdict of accidental death not resulting directly or indirectly from disease was warranted. On appeal the charge was sustained as correct and a verdict for the plaintiff upheld. In discussing the question as to whether the idiosyncracy of insured was a bodily infirmity, the court said: " This brings us to the second question in the case: Was the idiosyncracy of insured a bodily infirmity? We think not. The uncontradicted testimony of the experts examined in the case was that it was not an infirmity, but a peculiarity. If there were any question about the matter, it would seem to be a question of fact; and with the evidence all one way it was within the province of the court to instruct the jury as to their finding with regard thereto. But, apart from this, we think that the court would have been justified in holding, as a matter of law, that the idiosyncracy of insured as explained by the experts was not a bodily infirmity within the meaning of the double indemnity clause. * * * It is true that in the cases in which these words have been defined the point involved has usually been whether they would cover a temporary ailment as distinguished from one of a permanent nature; but the definitions given them negative the idea that they could possibly include a personal peculiarity, not in any

wise impairing bodily health or strength, and not in any way interfering with the functioning of the organs of the body. As said by the Circuit Court of Appeals of the Third Circuit: ' An infirmity of the body, as the term implies, is something that materially impairs the bodily powers.' *Black* v. *Travelers' Ins. Co.*, 121 F. 732; 58 C. C. A. 14; 61 L. R. A. 500."

Our attention is called to the decision of this court in *Barnstead* v. *Commercial Travelers' Mutual Accident Assn.* (204 App. Div. 473). In that case the insured had died following the administration of nitrous oxide gas, commonly known as " laughing gas," by a dentist whom he had visited to have a tooth extracted. An autopsy disclosed a condition which was known as status lymphaticus, or a congenital state of unknown cause characterized by an abnormal persistence of a gland in the chest, known as the thymus gland. The expert witnesses on the trial had disagreed as to whether this was a disease or merely an abnormal condition, but it was agreed that a person who was subject to it was liable to sudden death from slight causes. In that case the issue as to whether death had resulted solely and exclusively from accidental means had been submitted to the jury and resolved by it in favor of defendant. The verdict had been set aside by the trial court. On appeal this determination was reversed by this court and the verdict reinstated. Though we said that a direction of a verdict for the defendant would have been warranted by the proof, in fact we reinstated the jury's verdict.

In that case it may be noted that there was found a demonstrable physical abnormality as disclosed by the autopsy. The triers of the fact might have found the gas administered had impinged upon this physical abnormality to cause death. Such a condition may have been found to be an infirmity or a disease.

We have no proof in the present case of any such demonstrable physical abnormality, but merely of the existence of a peculiarity in the make-up of the patient which made him hyper-susceptible to the drug. We think that the *Barnstead* case is clearly distinguishable on its facts from that now presented. Here we have no disease or infirmity upon which neo-salvarsan might seize to bring about the death of the insured. In the common speech of man, a mere predisposition or hyper-susceptibility to the use of an otherwise harmless drug would not seem to be an infirmity or disease.

Another question presented on this appeal concerns the admission of a death certificate offered in evidence by the plaintiff. In addition to reciting the time and place of death the certificate contained the following:

"The principal cause of death and related causes of importance were as follows:

"Dermatitis ex foliatium (Arsenical).

"Syphilis — Secondary."

Before offering the death certificate plaintiff's counsel stated that he presented it solely for the purpose of proving death. The court, over plaintiff's objection, received the certificate for all purposes.

We need not determine whether this was error. Assuming that the document presented some evidence that syphilis was a secondary cause of death, that was at most a contradiction of the other medical proof offered by plaintiff, and made the issue one for the jury.

Respondent further contends that the judgment must be sustained because no adequate proof of claim showing an accidental death was presented to it by the plaintiff, as required by the policy.

Plaintiff's proof consisted of an affidavit signed by the beneficiary and duly verified. In that affidavit she stated that the insured had died from accidental arsenical poisoning, and that she claimed accidental death benefits. It contained the usual statements to identify the assured and the policy under which the claim was made. The policy calls merely for "due proof" of death. Such a requirement is met by verified proof, and need not have medical certificates supporting it. (*O'Reilly* v. *Guardian Mutual Life Ins. Co.*, 60 N. Y. 169.) An affidavit verified by the beneficiary containing the necessary data has been held sufficient to meet the requirements for "due proof." (*Dana* v. *Northwestern Mutual Life Ins. Co.*, 152 Misc. 383; affd., 236 App. Div. 836.) In any event, no point was made below concerning the insufficiency of the proof. In fact, defendant accepted the same and paid the face amount of the policy, contesting only the question of double liability.

We deem that there were issues of facts in this case which were required to be submitted to the jury, and it was error to direct a verdict for the defendant.

The judgment should be reversed and a new trial ordered, with costs to the appellant to abide the event.

O'MALLEY and DORE, JJ., concur; TOWNLEY and COHN, JJ., dissent and vote to affirm on the authority of *Barnstead* v. *Commercial Travelers' Mutual Accident Assn.* (204 App. Div. 473).

Judgment reversed and a new trial ordered, with costs to the appellant to abide the event.