## PREFERRED ACCIDENT INS. CO. v. CLARK.
### No. 2880.

Circuit Court of Appeals, Tenth Circuit.
July 15, 1944.

N. E. Snyder, of Kansas City, Kan., and Henry M. Shughart, of Kansas City, Mo. (Errett P. Scrivner, of Kansas City, Kan., on the brief), for appellant.

Douglas Stripp, of Kansas City, Mo., (Lee Vaughan, Jr., of Kansas City, Kan., and Henry N. Ess, Paul Barnett, and Watson, Ess, Groner, Barnett & Whittaker, all of Kansas City, Mo., on the brief), for appellee.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

PHILLIPS, Circuit Judge.

On December 24, 1912, the Preferred Accident Insurance Company[1] issued its policy of accident insurance to Walter P. Clark.[2] Anna Mae Clark[3] brought this action to recover accidental death benefits as the named beneficiary in the policy. The policy insured against loss or disability as defined therein "resulting directly, independently and exclusively of any and all other causes from Bodily Injury effected solely through Accidental Means." It provided that if such bodily injury should be the sole and direct cause of death, the insurer would pay the named beneficiary $7,500. In December, 1940, the insured began to suffer with a gall bladder condition. On December 19, 1940, he was taken to the Menorah Hospital in Kansas City, Missouri, suffering with chills and fever of bile tract origin. The infection had gone up into the liver ducts and his physician did not think an operation was then advisable. He attempted to relieve the condition by medication. Insured was released from the hospital in January, 1941. Between that date and April 21, 1941, he had recurring gall bladder attacks. He was again taken to the hospital on April 21, 1941. His condition was diagnosed as chronic infection of the gall bladder with gallstones and an involvement of the bile duct and appendix. An operation was performed on April 25, 1941, at which time the gall bladder and appendix were removed and the common bile duct drained. Some small stones were found in the common bile duct. His appendix was quite large and inflamed. Following the operation, he suffered an acute massive pulmonary collapse and died therefrom on April 26, 1941, approximately 24 hours after the operation. The pulmonary collapse developed 12 to 18 hours after the operation. An autopsy was performed. One of his family physicians was present. The diagnosis made was:

"Extensive atelectasis of both lungs after a
cholecystectomy
Acute bronchitis
Parenchymatous degeneration of liver and kidneys."

---

[1] Hereinafter called the insurer.
[2] Hereinafter called the insured.

[3] Hereinafter called the beneficiary.

The evidence established that pulmonary collapse sometimes follows major abdominal operations; that it is more frequent when the operation is in the upper abdominal cavity; that it only occurs in a small percentage of cases and is not to be expected as a natural and probable consequence of an operation. The anesthetic was administered and the operation performed without mishap or mistake.

While pulmonary collapse occurs infrequently as the result of abdominal operations, it is common practice to guard against it by administering carbon dioxide gas following such operations.

The trial court held that death resulted directly, independently, and exclusively of any and all other causes from bodily injury effected solely through accidental means.

From a judgment on the policy in favor of the beneficiary, the insurer has appealed.

The insurer contends that there was no proof that the operation caused the pulmonary collapse of the lungs. To meet this contention, the beneficiary relies on the testimony of two witnesses for the insurer. Dr. Buckingham, a witness for the insurer, testified that a pulmonary collapse of the lungs is a condition that is seen most often following upper abdominal operations due to the following reasons: The patient has an incision in his abdominal wall that is sewed together and his ordinary breathing causes some pain. Instead of taking deep breaths and washing out his lungs with fresh air, the incision causes him to breathe shallow and short. When the abdomen is open, air is allowed to enter the abdomen which naturally goes to the highest part of the abdominal cavity. This air underneath the diaphragm tends to crowd the diaphragm and causes more or less of a partial paralysis of the diaphragm so that the breathing is more or less hindered and interfered with. In addition, the patient is given morphine to control the pain. The morphine inhibits respiration so that the patient does not breathe deeply. All these things tend to cause a stagnation in the respiratory mechanism which would tend to wash and clear out these secretions that form at the time of the operation and following the removal of the patient into bed. He is not allowed to cough. He cannot spit these things up and they lie in the bronchial tubes and become thick and act as a plug. Fluids are not given and that makes the plug thicker and it stays in the bronchial tubes and causes this condition.

Dr. Leitch, a witness for the insurer, testified that the collapse was due to the anesthesia.

Thus, it will be seen that the testimony of the witnesses for the insurer justified the court in finding that the anesthesia and the operation caused the collapse of the lungs which resulted in the insured's death.

The insurer further contends that the trial court was not justified in concluding that the death resulted directly, independently, and exclusively of any and all other causes from bodily injury effected solely through accidental means.

It was stipulated that the policy was a New York contract. We must, therefore, look to the law of New York.[4] While the New York decisions are not altogether consistent, we think it may be said that the New York courts do not recognize the distinction drawn in some jurisdictions[5] between insurance against loss from accidental means and loss from accidental result.

In Mansbacher v. Prudential Ins. Co. of America, 273 N.Y. 140, 7 N.E.2d 18, 19, 20, 111 A.L.R. 618, the court said: "The insurance company now emphasizes the words 'accidental means,' and would have an exception drawn between 'accidental death' and 'death caused by accidental means' as though any ordinary person seeking a $2,000 policy would understand this logomachy. * * * Accidental death means death by accident, and excludes suicide; death occurring through 'accidental means' in this case and under these circumstances is the same as death occurring 'by means of an accident.'"

We think the test laid down by the New York decisions is whether the average man, under the existing facts and circumstances, would regard the loss so unforeseen, unexpected, and extraordinary that he would say it was an accident. In Lewis v. Ocean Accident & Guarantee Corp., 224 N.Y. 18, 120 N.E. 56, 57, 7 A.L.R. 1129, the court said: "We have held that infection resulting from the use of a hy-

---

[4] Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487.

[5] See Sentinel Life Ins. Co. v. Blackmer, 10 Cir., 77 F.2d 347.

podermic needle is caused by 'accidental means.' Bailey v. Interstate Casualty Co., 8 App.Div. 127, 40 N.Y.S. 513; Id., 158 N.Y. 723, 53 N.E. 1123; Marchi v. Aetna Life Ins. Co., 140 App.Div. 901, 125 N.Y.S. 1130; Id., 205 N.Y. 606, 98 N.E. 1108. The same thing must be true of infection caused by the puncture of a pimple. Unexpected consequences have resulted from an act which seemed trivial and innocent in the doing. Of itself, the scratch or the puncture was harmless. Unexpectedly it drove destructive germs beneath the skin, and thereby became lethal. To the scientist who traces the origin of disease there may seem to be no accident in all this. 'Probably it is true to say that in the strictest sense, and dealing with the region of physical nature, there is no such thing as an accident.' * * * But our point of view in fixing the meaning of this contract must not be that · of the scientist. It must be that of the average ʿman. * * * Such · a man would say that the dire result, so tragically out of proportion to its trivial cause, was something unforeseen, unexpected, extraordinary, an unlooked-for mishap, and so an accident. This test—the one that is applied in the common speech of men—is also the test to be applied by courts." See, also, Borneman v. John Hancock Mut. Life Ins. Co., 289 N.Y. 295, 45 N.E.2d 452; Silverstein v. Metropolitan Life Ins. Co., 254 N.Y. 81, 171 N.E. 914.

And so the New York courts have regarded death as accidental where it resulted from trivial causes such as infection following the puncture of a pimple, Silverstein v. Metropolitan Life Ins. Co., supra; the administration of a sedative of morphine and atropine, Simpson v. Travelers' Ins. Co., 2 Cir., 121 F.2d 683; an overdose of veronal taken as a sedative, Mansbacher v. Prudential Ins. Co. of America, supra; death from sunstroke, Gallagher v. Fidelity & Casualty Co. of New York, 163 App.Div. 556, 148 N.Y.S. 1016, 1021; Id., 221 N.Y. 664, 117 N.E. 1067; a self-inflicted hemorrhage, Schwartz v. Commercial Travelers' Mutual Accident Ass'n of America, 132 Misc. 200, 229 N.Y.S. 669; Id., 227 App.Div. 711, 236 N.Y.S. 896; Id., 254 N.Y. 523, 173 N.E. 849.

But, in Bennett v. Equitable Life Assur. Soc., Sup., 13 N.Y.S.2d 540, 541, the court said: "The insured's death did not occur in consequence of bodily injury effected solely through external, violent and accidental means. Mansbacher v. Prudential Ins. Co. of America, 273 N.Y. 140, 7 N.E. 2d 18, 111 A.L.R. 618, and Berkowitz v. New York Life Ins. Co., 256 App.Div. 324, 10 N.Y.S.2d 106, are not here controlling, as in those cases the causes were trivial and were followed by some unforeseen, unexpected, extraordinary, and unlooked-for mishap. Here, however, death ensued as the result of post-operative pulmonary embolism. In such event, the cause was neither trivial nor the result unforeseen." See, also, Borneman v. John Hancock Mut. Life Ins. Co., supra.

We can see no distinction between a case where death results from embolism caused by a major operation and one where death is caused from a massive lung collapse caused by a major operation. Both were eventualities which rarely, but sometimes, flow from major abdominal operations.

While the decision in Bennett v. Equitable Life Assur. Soc., supra, was by a New York intermediate appellate court, it is "a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." [6]

Excluding those cases where the condition of the patient is desperate and an operation is resorted to with the hope of possibly saving his life, we know that death does not ordinarily result from a major abdominal operation. Yet we also know that death does result from complications arising after major abdominal operations in a limited number of cases, and that, while the patient does not expect death, he knows it is a possible eventuality. For example, one who submits to a simple appendectomy, where the condition is not acute, knows that he may be one of a comparatively small number who will die as a result of the operation. He does not expect death but he knows it may occur. In such cases, we do not think an ordinary man would say that the death was accidental. Here, the insured was suffering from a chronic gall bladder ailment. In addition to that, his appendix was seriously involved. He

[6] West v. American T. & T. Co., 311 U. S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139, 132 A.L.R. 956; Fidelity Union Trust Co. v. Field, 311 U.S. 169, 177, 178, 61 S.Ct. 176, 85 L.Ed. 109.

was also suffering from a parenchymatous degeneration of the liver and kidneys. He was 62 years of age. We do not think that the ordinary man, under the attending facts and circumstances, where a major operation in the upper abdominal cavity caused a pulmonary collapse resulting in death, would regard the death as accidental.

The judgment is reversed and the cause is remanded with instructions to grant the insurer a new trial.