## Metropolitan Life Ins. Co. v. Osborne.

Feb. 4, 1941.

302

Rouse, Price & Adams for appellant.

Benton, Benton, Smith & Luedeke and A. C. Hall for appellee.

OPINION OF THE COURT BY JUDGE CAMMACK—Affirming.

The Metropolitan Life Insurance Company issued a $5,000 accident policy to Richard Osborne, in 1935. Osborne was insured against the results of bodily injuries sustained while the policy was in force and caused directly and independently of all other causes by violent and accidental means. Under the heading of "Risks Excluded," the policy provided that it would not cover suicide, and "nor shall it cover injury, disability, death or any other result caused wholly or partly, directly or indirectly by ptomaines or disease germs or any kind of infection, whether introduced or contracted accidentally or otherwise (excepting only septic infection of and through a visible wound caused directly and independently of all other causes by violent and accidental means) * * *."

In July, 1935, Osborne consulted a physician for a sore finger. It developed that he had diabetes for which he was treated until the early part of February, 1936. Osborne's policy was renewed late in February, 1936, the company having knowledge of his previous treatment for diabetes. On or about March 17, 1936, a chiropodist removed part of an ingrown toenail from the fourth toe of Osborne's right foot. The toe became sore and he consulted his physician about it on March 23, 1936. The physician treated the toe for several days and when he again saw Osborne, some 10 days after the first period of treatment, he found the toe red and sore at the base. Subsequently, it became black and a septic and gangrenous condition developed. Osborne was removed to a hospital early in May, 1936. His condition grew worse and he died the latter part of August, 1936, after a second amputation on his right leg. His death resulted from the septic and gangrenous condition, aggravated by diabetes.

The appellee herein, Grace Osborne, wife of the deceased, was the beneficiary in the insurance policy. She was successful in her action to recover on it.

Reversal is urged primarily upon the ground that a peremptory instruction should have been given in favor of the Insurance Company. Other grounds are (1) the court erred in the admission of certain evidence; (2) the court erred in its instructions to the jury; and (3) counsel for Mrs. Osborne made improper arguments before the jury.

A sister-in-law and a granddaughter, who made her home with the Osbornes, testified that Osborne came home limping during the afternoon of March 17, 1936; that he took off his shoe and he had a cut place on the fourth toe of his right foot near its base and on the side next to the small toe; that the place had been bleeding and, when Osborne removed the cotton from it, it began bleeding again; that the cut place was from one-eighth to one-fourth of an inch in length; that they could not tell how deep the cut was because of the bleeding; and that Osborne put some more cotton on the place and put his shoe back on. The chiropodist, who testified for the Insurance Company, said that he did some work on Osborne's feet on or about March 17th, but that he did not do any work on the toe in question and that at no time did he cut Osborne's toe or foot.

The appellee insists that the court erred in not permitting the sister-in-law and the granddaughter to testify that, when Osborne came in and showed them the cut place, he said the chiropodist had let an instrument slip, and that the instrument had made the cut. It is insisted that this evidence was part of the res gestae. We think it was properly excluded. Some half hour or more had expired between the time that Osborne had been treated by the chiropodist and the time he reached home. Sparks Bus Line v. Spears, 276 Ky. 600, 124 S. W. (2d) 1031.

Osborne consulted **Dr. Koehler** with reference to the soreness of his toe on March 23rd. On the next day the doctor called at Osborne's home to treat the toe. He treated it for six or seven days thereafter. The doctor testified that Osborne showed him his toe; that it was red and swollen some, and looked as though the nail had been cut "a little short in the course of manicuring his toenails"; that Osborne showed him his foot and said, "Look at it, Doctor, it looks like he cut it a little too close"; that he did not notice a cut place at the base of the toe and that he could not recall whether his attention was directed to it, or that Osborne told him the chiropodist's instrument had slipped, cutting him at the base of the fourth toe; and that after he had treated Osborne's toe for several days "the place looked apparently well," or that he could take care of the condition by himself. On cross-examination he testified: "The infection improved, that is, the original infection, that is,

the sore toe improved in the course of six days''; that he saw Osborne about ten days after the first period of treatment, and at that time "there was a sore area round the dorsum on the right foot on this area right down at the base of the toe (the fourth toe)''; that Osborne told him, "I got some tight shoes, or new shoes, and they seemed to have rubbed a place or traumatized it a bit''; and that I couldn't tell whether it was rubbed or not, but it was sore there.'' Osborne's condition steadily grew worse, the infection developing into gangrene and extending up into his foot and leg. He was later removed to the hospital.

After Dr. Koehler had testified that he could not recall whether Osborne had called his attention to the cut on his toe, and that when he first saw Osborne his fourth toe was "red, sore and painful, and I imagine if it had been there I would have seen it if the foot was bad,'' the granddaughter was permitted to testify that she heard Osborne say in the presence of her grandmother and Dr. Koehler that the chiropodist's instrument slipped and cut him between the toes on the right foot. The Insurance Company insists that this evidence was incompetent as substantive evidence, because it was introduced solely to impeach Dr. Koehler. We think otherwise; but even if the evidence was improperly admitted we do not think that it was such as to be prejudicial to the Insurance Company's substantial rights.

Over the objections of the Insurance Company Drs. Miller and Bender were permitted to testify as to the history of the case given them. Complaint is directed also to the opinions given by these doctors as to the cause of Osborne's death, and to the method in which they obtained their information. Dr. Miller first saw Osborne early in July. He then advised amputation and later did the amputating. Dr. Bender assisted Dr. Miller during the last month of Osborne's illness.

When asked, "Who gave you that information?" (referring to whether it was obtained from Osborne or the doctor who first treated Osborne when he was taken to the hospital) Dr. Miller testified:

"A. Both of them. You see, we were there in the room. This fellow is lying in bed. He had been in the hospital two or three days before that, I guess. Dr. Shriner calls me up and says, 'Miller, I have a

case I want you to see.' I said, 'All right, I'll be over there in the morning.' I don't know, I think it was in the morning I went over. The history will tell you that. So, I went to see him. Then I got the history from the man and Dr. Shriner that he had an ingrown toenail and the doctor he had, whoever he was, cut it open and his knife slipped and he got a cut in there. An ingrown toenail in the first place is always infected. If you ever had one you know that it sticks down into the flesh and you have got an infection and if you cut the toenail without cutting into the flesh, it is fine, but if you dig into the flesh, you open up avenues of infection and you get sepsis through there."

This doctor testified that Osborne had sugar in his blood and that diabetics, as a rule, do not heal as well as persons without the disease. As to the cause of Osborne's death, Dr. Miller testified:

"A. The primary cause of that man's death was infection, blood poisoning, and secondary, he showed in the hospital that he had diabetes, having blood sugar, but no sugar appeared in his urine. We examined his urine. The records will be up there and the records show that his urine never showed sugar but he did have blood sugar, see.

"Q. 24. Was diabetes the cause of his death? Counsel for Defendant objects; The Court overruled the objection; Counsel for Defendant excepts.

"A. I don't think so. I think his infection was the cause of his death. Here is how I look at the thing. If that fellow hadn't had an injury to his toe, he probably wouldn't ever have known that he had diabetes, see."

Dr. Bender testified that:

"The history that I got was that a matter of several months previous he had been cut while having his feet treated by a chiropodist and the gangrene had developed after that."

He testified further that he thought the gangrene was due to the injury as the actual inciting cause. When asked whether or not diabetes was the cause of Osborne's death, he said, "No, he didn't die from dia-

betes; that is his death wasn't a diabetic death in and of itself.'' When asked upon cross-examination upon what he based his opinion that diabetes did not altogether cause Osborne's death, this doctor said:

"Well, I said that his death was not a diabetic death in and of itself in that he showed no terminal elevation of his blood sugar or urinal sugar; he didn't go into a diabetic coma but his death was more the death of sepsis which was caused by the gangrene. Rather than having a high blood pressure and being comatose, he showed the opposite. By that, I mean low blood pressure and feeble pulse. He was profoundly septic.''

We find no basis for objection to the evidence of Drs. Miller and Bender as to their views of the cause of Osborne's death, and the manner in which they obtained their information. We think it was competent for them to testify also about what they learned in the history of Osborne's case as to the manner in which the infection began. These doctors treated Osborne and they obtained their information while he was under their care. True it is that they did not see him until the gangrenous condition was far advanced, but we do not think that alters the case. It was a natural thing for the doctors to inquire as to how the condition developed, including its cause. Such information could well be vital in making a thorough diagnosis of a case and for its treatment. The Insurance Company says in its reply brief:

"The condition of the foot and leg which was visible, was all that was necessary for diagnosis and treatment by Dr. Miller or by his assistant, Dr. Bender. The Court erred in refusing to sustain appellant's objection to the case history as related by Drs. Miller and Bender.''

We cannot agree with this conclusion. The ruling herein is consistent with our rulings in the cases of Hill's Adm'x v. North America Accident Ins. Co., 185 Ky. 520, 215 S. W. 428; Chesapeake & Ohio Ry. Co. v. Hay, 248 Ky. 69, 58 S. W. (2d) 228; Horn's Adm'r v. Prudential Ins. Co. of America, 252 Ky. 137, 65 S. W. (2d) 1017.

In urging that a peremptory instruction should have been given in its favor the Insurance Company insists

that the injury complained of was not the result of accident and that the evidence fails to show that the septic infection and the wound complained of were the sole or any cause of the death of the insured. Reference is made to the wound at the base of Osborne's right toe, said to have been received March 17th, the closely trimmed toenail which Dr. Koehler treated for several days beginning March 23rd, and the rubbed place which Dr. Koehler said Osborne told him was caused by a "tight or new shoe," which he first saw about 10 days after he had first treated Osborne. It is also insisted that the alleged cut at the base of Osborne's toe was not located with sufficient definiteness. There is also some question as to whether or not the septic condition which later became gangrenous developed at or near the spot where the wound was said to have been inflicted by the slipping of the knife of the chiropodist. It is our view, however, that the question of Osborne's sore toe, which was treated by Koehler for several days after March 23rd, can be disposed of. There may have been an infection when the toenail was trimmed on March 17th, and if that was the case it is all the more likely that, if the chiropodist's knife did slip and cut Osborne's toe at the base, the infection was carried to that spot. In any event, Dr. Koehler testified that the condition of Osborne's toe had cleared up sufficiently for him to discharge him after the first period of treatment to the toe. When he saw Osborne next, some 10 days later, the septic condition he then discovered, which later became gangrenous, was not at the place where the toenail had been trimmed, but rather at the base of the toe. We think the evidence shows clearly that this was the place, or about the place, where the alleged wound was inflicted. Nor do we think that the testimony as to the "tight shoe" and "a rubbed place" alters the situation. There was no testimony that this place was infected, or that there was an actual abrasion of the skin at the so-called rubbed place. We think the record shows that diabetes did not cause Osborne's death, though it may have aggravated his condition.

Objection is raised to the following instructions:

"1. If you believe from the evidence that on or about the 17th day of March, 1936, during the life of the policy presented in evidence herein, the decedent, Richard E. Osborne, sustained a visible

wound on the fourth toe of his right foot; that said wound was caused directly and independently of all other causes by violent and accidental means; that said wound became infected with septicaemia directly and independently of all other causes resulting in the loss of decedent's life on the 26th day of August, 1936; that the proximate cause of his death was the said septicaemia infection of and through said visible wound caused directly and independently of all other causes by violent and accidental means; that said injuries directly and independently, from the date of the accident aforesaid, wholly and continuously disabled and prevented the decedent from doing all the substantial acts required of him in his business, and that during the period of such total and continuous disability and within two hundred weeks from the date of the accident said injuries directly and independently of all other causes resulted in the loss of decedent's life, then you will return your verdict for the plaintiff in the sum of $5,000.00, together with interest at the rate of 6% per annum from November 24, 1936, being the amount of said policy of insurance and the amount claimed in the petition; if you believe otherwise, you will find for the defendant."

"2. 'Accidental means,' as used in these instructions, as to the person injured, means that the injury was unforeseen, unexpected, and not brought about through his agency designedly, or was without his foresight, or was a casualty or mishap not intended to befall him, and in which event the occurrence was accidental and the injury one inflicted by accidental means, within the meaning of the policy involved herein."

It is first insisted that Instruction No. 1 is confused and misleading because of the manner in which it is framed and also because it makes no reference to the injury at the base of the toe. It is pointed out that the second instruction undertakes to define "accidental means," whereas the words "violent and accidental means" appear in the policy. It is insisted also that this instruction adds to the confusion in the so-called "involved Instruction No. 1." We can not agree with these objections. We do not think that Instruction No. 1 was so framed as to be confusing to the members of the jury.

There was ample evidence showing the connection between the injury to Osborne's toe and his death. Instruction No. 1 adequately covered the question raised in this case.

It is next insisted that Instruction "X" which was offered by the company should have been given. This instruction is:

> "The Court instructs the jury that the history of insured's physical infirmity and bodily injury, if any, and any circumstance or circumstances connected therewith related by insured, Richard N. Osborne, to physicians, testified to in this action by such physicians, are not proof of any fact or facts or circumstances so related by the insured. Such history and circumstances in the evidence herein are for the sole purpose of aiding said physicians to ascertain and determine the presence in insured of disease, if any, and for the further purpose of proper treatment of the insured."

It has already been pointed out that the evidence toward which this instruction is directed was admissible. There was no basis whatever for the giving of such an instruction.

Lastly, complaint is made of the following statements made by counsel for Mrs. Osborne in his argument before the jury:

> "Osborne took out this policy so that Mrs. Osborne could take care of herself and her granddaughter.
>
> "They discovered he had sugar in his blood before they renewed that policy.
>
> "I'd like to have heard what the agent said when he renewed that policy, after the company knew he had diabetes."

We find no basis for the objection to these statements.

It follows that it is our view that the judgment should be, and it is affirmed.