## Pyramid Life Ins. Co. v. Milner.

Jan. 23, 1942.

250

Wheeler & Shelbourne for appellant.

Blackburn & Blackburn and Albert Karnes for appellee.

OPINION OF THE COURT BY JUDGE TILFORD—Affirming.

This action was instituted to recover $2,000 on an insurance policy by which appellant promised to pay appellee as beneficiary $1,000 upon receipt of proof of the death of her husband, William R. Milner, and an additional $1,000 in the event his death resulted solely from

bodily injuries caused directly, exclusively, and independly of all other causes by external, violent, and purely accidental means. In its answer, the appellant offered to confess judgment for $1,000, but denied that the insured died as the result of an accident. The issue thus formed was submitted to a jury which returned a verdict for the full amount sued for, and from the judgment entered on that verdict this appeal is prosecuted.

It is conceded that on December 8, 1939, Milner was burned upon his face, ears, neck, and hands; that he had apparently enjoyed sound health prior to that time; that continuously thereafter, he was confined to his bed or home until his death, which occurred on January 15, 1940; and that the immediate cause of his death was nephritis. The medical testimony conclusively established that nephritis frequently results from burns; and, while it was conflicting as to whether or not Milner's burns were sufficient in nature and extent to have brought about that result, it is not contended that it was insufficient to take the case to the jury on that issue. Hence, we shall not discuss that phase of the case further, other than to say that since the court in its instructions had predicated appellee's right to recover the accidental death benefit upon the jury's belief that Milner's death resulted "solely from bodily injuries caused directly, exclusively, or independently of all other causes by external, violent, and purely accidental means," and had directed a verdict for the appellant unless the jury so believed, the appellant was not prejudiced by the refusal of the court to give a tendered instruction, specifically directing the jury to find for the defendant if they believed that the death was caused by nephritis, "unless" that disease "was the direct result of burns caused by external, violent, and purely accidental means."

Since the other grounds for a reversal urged by appellant's counsel are bottomed upon the alleged failure of the competent evidence to show that the insured was accidentally injured, it becomes necessary to briefly relate the facts before discussing appellant's specific complaints: The insured was forty-seven years of age at the time of his death, and resided with his wife, his fifteen year old son and ten year old daughter, in a four room house consisting of two front rooms, and two small rear rooms used as a dining room and kitchen, which had been moved back a short distance and to one side and

thus separated from the front living rooms so as to leave space for contemplated improvements. On the morning he was injured, he and his family were planning a trip to Paducah with a neighbor; and in preparation for the trip the insured retired to the kitchen for the purpose of dressing or shaving. In the kitchen were shelves and a hot stove which, so far as the record shows, was the only source which could have ignited the inflammable substance which caused the burns. No one witnessed the inception of the flames, and the first knowledge that any competent witness had that the insured had been burned was acquired when he ran out of the kitchen with his face and hands aflame and plunged them into a water trough. This witness, the son, testified that his father had shaved; that he kept rubbing alcohol in the kitchen, which, together with a face lotion, he was accustomed to rub on the back of his neck and face; and that a little piece of burned paper was found in the room after the burns had been inflicted. The doctor was immediately called, neighbors hurried to the scene, and one or more of the latter introduced by appellant testified that they detected an odor which they thought was gasoline, naptha gas, or which might have been kerosene. One witness testified that a peanut butter jar having the odor of gasoline was found near the water barrel; one, that the children were screaming "gasoline, gasoline"; and another, that Mrs. Milner cried "gasoline, gasoline." The son called in rebuttal admitted that he had "hollered" "gasoline, gasoline," but denied that his mother had done so. He further testified that the peanut butter jar referred to had been broken a long time, and that it smelled of gasoline because it had a little kerosene in it at the time he had broken it. Leon Gibson, who arrived on the scene five or ten minutes after the burning, said, in response to directions to tell what happened:

> "Well, when I got over there Mr. Milner was burned so badly that he was insane, he was going from one room to another, he was in terror and some of them asked him how it happened and he said, 'I don't know, I felt something on my head and it blazed up and I run out and jumped over the fence into the water barrel and got it put out.' He said, 'I thought Fannie had poured some water on my head,' and she said, 'Rufus you know I did not do that' and he said, 'I know you did not' and then Dr. Morris came."

On cross-examination he testified:

"Q. What you heard Mr. Milner say was 'he thought his wife threw something on him.' A. He thought she was playing, he felt something on his head and he thought it was water and he ducked his head on the stove, he ducked his head and it hit the stove."

Afterward this witness denied that he had testified that Milner had said that his "head hit the stove." Mrs. Gibson testified that on one occasion during Milner's last illness he told her:

" 'We are going to have to go to court over this burning' and he said he did not blame them they were trying to find out how it was done but he did not intend for Mrs. Milner to get on the witness stand, that he would tell the world she did not do it."

The following testimony was elicited during the examination of B. Carneal:

"Q. Did Rufus make any statement to you after you got there that morning? A. I don't think he knew who I was.

"Q. Mr. Carneal did Mr. Rufus Milner say that he was murdered. A. He never said he was murdered, he said 'murder' he never told me that he was murdered.

"Q. What did he say about that? A. He said 'murder in the first degree.' He said that two different times. He talked about his horses and everything else."

Re-direct examination:

"Q. You say he was talking about his horses and everything else? A. Yes sir he was out of his head, I don't think he knew anything he was saying. He asked who I was a little while after I got over there.

"Q. What did he say about his horses? A. He was talking about his horses and called his boy's name two or three times. I don't know what all he did say."

The appellant's witness, Thomas Parker, gave the following testimony as to a conversation with Milner occurring a few minutes after he had been burned:

"Q. Did you ask him how he was burned? A. Yes sir.

"Q. What did he say? A. I said 'What on earth is the matter and what happened' and he said, 'Oh Mr. Parker I am burned, they have ruined me.'

"Q. Did he look at anybody when he said that? A. He did not look at me or his wife or anybody else, he had his eyes closed and was waving his hands. He was burned on his face, his ears and his neck and chest."

Arley Long introduced by the appellant testified:

"A. Mrs. Milner was standing in the door wringing her hands and said 'gasoline.' I said, 'How did it happen' and she said, 'I don't know unless he threw it in the stove.'

"Q. What did he say? A. He said 'I never threw it in the stove' I was standing there at the barrel and he said 'Put me out' and I said 'You are not on fire now' and he looked up and said 'Honey how come you to throw that on me' and she said 'Darling I did not throw anything on you' and he said 'Oh you have ruined me.' "

Dr. Morris was the first physician who attended the insured. Introduced by appellant and asked by its counsel whether the insured had made any statement to him as to how he had sustained the burns, he stated:

"A. He told me. I asked him and he said he was over the cooking stove washing his face, leaning over this way and said the first thing he noticed, something hit him that felt cold, and the next thing he knew he was afire. That's what he told me.

"Q. Did he tell you how that happened, whether anybody threw it or how? A. He said he didn't know how it happened."

It should be apparent from the foregoing resumé of the testimony that there is no tenable basis for appellant's contention that the evidence was insufficient to sustain a finding that Milner's death resulted from an accident within the terms of the policy. On the contrary, though it did not show all of the details, the testimony conclusively established that the injuries were not intentionally self-inflicted or the contemplated result of any

act committed by him. There was no proof that appellee, or any other person, threw the inflammable substance at or upon the insured, notwithstanding the sinister intimations drawn from his fleeting impression that she had done so in play.

It is true, as stated by appellant's counsel, that it has been written by this court that an injury is not produced by accidental means within the terms of an accident insurance policy, where it is the direct, though unexpected, result of an ordinary act in which the insured intentionally engages. Salinger v. Fidelity & Casualty Co. of New York, 178 Ky. 369, 198 S. W. 1163, L. R. A. 1918C, 101. But the term "accidental means" is not susceptible to exact definition, and "depends for its application upon the facts in each particular case"; and though the direct result of an ordinary act intentionally committed cannot ordinarily be said to have been caused by accidental means, the means are, nevertheless, accidental where the result is wholly unintentional and unexpected. National Life & Accident Insurance Co. v. Jones, 260 Ky. 404, 86 S. W. (2d) 139. To illustrate: If the insured had intentionally caused the inflammable substance to ignite but had not anticipated that he might be burned, his beneficiary, in the absence of intervening, accidental, causative factors, could not recover; but, if the combustion itself was wholly unanticipated, she cannot be defeated merely because the combustion was the direct result of the ordinary use near a heated stove of an inflammable substance. The employment or use of inflammable materials in a heated room and near the source of the heat may be negligence, but negligence setting in motion the chain of circumstances which cause or contribute to the result does not operate to remove such result from the category of those caused by accidental means.

In its last analysis, appellant's contention apparently amounts to this: Although there was in the room an inflammable substance which the insured was accustomed to rub on his face and neck, and a very hot stove over which he was leaning, and an entire absence of proof of motive for the infliction of injuries, it cannot be said that the burns were caused by accidental means, since neither the insured nor any witness was able to state how he came in contact with the inflammable material, or what caused it to become ignited. If the policy had limited appellant's liability for accidents producing death to

those resulting from the operation of particular instrumentalities under prescribed circumstances, as did the policy sued on in the case of North American Accident Insurance Co. v. Caskey's Adm'r, 218 Ky. 750, 292 S. W. 297, relied on by appellant in support of its objections to the sufficiency of the proof and its criticism of the instructions, the objections and criticism would be well founded. But all that the policy here sued on required as a condition to liability for the insured's accidental injury was that his death should result within ninety days "solely from bodily injuries, caused directly, exclusively or independently of all other causes by external, violent and purely accidental means"; and the instructions, following the language of the policy, although open to some of the technical objections urged, properly submitted that issue.

The remaining specific complaint of appellant is that the court, over appellant's objection, permitted appellee to testify that she saw fire on her husband; that he came out of the room with his face and hands on fire; that his hands and face were blazing; that she did not throw anything on him; that she assisted in taking care of him prior to his death; and that a shirt exhibited to her and introduced in evidence was the one he was wearing at the time he was burned. By the express provisions of Subsection 2 of Section 606, Civil Code of Practice, appellee was precluded from testifying "concerning any verbal statement of, or any transaction with, or any act done or omitted to be done," by insured; and in view of the construction heretofore placed by this court upon the words "transaction with" and "act done or omitted to be done" as used in the Code provision, there can be no doubt that the greater portion, if not all of the testimony referred to, was improperly admitted. Equitable Life Assurance Society of United States v. Bailey, 203 Ky. 339, 262 S. W. 280, 39 A. L. R. 160; North American Accident Insurance Co. v. Caskey's Adm'r, 218 Ky. 750, 292 S. W. 297; Penick v. Metropolitan Life Insurance Co., 220 Ky. 626, 295 S. W. 900; Prudential Insurance Co. of America v. Hodge's Adm'r, 232 Ky. 44, 22 S. W. (2d) 435. But we are admonished by Section 756, Civil Code of Practice, not to reverse a judgment except for an error to the prejudice of the substantial rights of the complainant. Hence, it becomes necessary to weigh the probable effect of the incompetent testimony.

It was conclusively established by the testimony of the insured's physician and neighbors that he was severely burned on his face and hands on the morning of the day referred to by the appellee. It was abundantly established by the statements of the insured to his physician and others that his face and hands suddenly caught on fire while he was in the room from which his son saw him run and plunge his face and hands in the water barrel; and his son's testimony was almost identical with that given by appellee. Appellee did not witness the accident which caused the burns, attempt to explain its cause, or testify to any act of her husband not otherwise shown. True, she denied that she had thrown anything on him, but there was no proof introduced by the appellant to substantiate its theory that she had done so. In short, excluding her testimony from consideration, the evidence was amply sufficient to sustain the verdict in her favor, and it is not conceivable that with her testimony excluded, the verdict would have been otherwise. We are therefore forced to the conclusion that the admission of appellee's incompetent testimony did not prejudice appellant's substantial rights, and hence, that the judgment should not be reversed because of its admission.

Judgment affirmed.