**BYCK et al.**

**v.**

**COMMONWEALTH LIFE INS. CO..**

Court of Appeals of Kentucky.

June 25, 1954.

Raymond C. Stephenson and Hottell & Stephenson, Louisville, for appellants.

William H. Abell and Ogden, Galphin & Abell, Louisville, for appellee.

STEWART, Justice.

On June 1, 1949, Commonwealth Life Insurance Company issued to the police pension board of the City of Louisville a written policy of group insurance providing among other things for the payment of $3,000 at the death from a natural cause of any police officer of that city and for the payment of an additional benefit of $12,000 in the event that the death of such officer resulted from an accident while on duty, provided such death was not caused or contributed to by disease.

The pertinent part of the policy reads:

"1. The company will pay, subject to the terms and conditions hereof and of this policy and to the exceptions specified below, an additional indemnity, to the beneficiary, in addition to the other proceeds of this policy, upon receipt of due proof that the death of any member insured hereunder occurred as a result, directly and independently of all other causes, of bodily injury effected after May 31, 1949 while performing the law enforcement duties of a law enforcement officer of the City of Louisville, Kentucky, effected solely and exclusively through external, violent, and accidental means evidenced, except in the case of drowning or of internal injuries revealed by an autopsy, by some mark or contusion visible on the exterior of the body, and that such death occurred prior to termination of this benefit and within one year after such injuries were sustained.

\* \* \* \* \* \*

"(3) This additional indemnity shall not be payable if death occurs—(a) as a result of \* \* \* disease or bodily or mental infirmity or medical or surgical treatment

thereof or infection of any nature, unless such infection was incurred through an external visible wound, sustained through violent and accidental means after May 31, 1949 while performing the law enforcement duties of a law enforcement officer of the City of Louisville, Kentucky * *."

The chain of circumstances leading up to the death of officer James Bell, age 32, who was covered by the insurance plan, began at about noon on December 24, 1951. On that particular day the deceased and a patrolman named McDowell were called to the Louisville & Nashville R. R. Co. office building in Louisville to investigate the occurrence of a suicide. They found that the suicide had fallen on a steel plate which covered certain steam exhaust pipes in the rear of the building. The plate was extremely hot and, when the two men began lifting the suicide's body off the plate, the back of Bell's left hand was severely burned. Subsequently, in an effort to locate the rest room in the office building from which the suicide had jumped, Bell made several hurried trips up and down the stairs inside from the fifth to the sixth floors to determine the window from which the suicide had leaped to his death. On the sixth floor he discovered a high-silled window and leaned out of it in search of some definite clue. As he did so, his feet slipped on the tile floor and he was about to fall out when he was grabbed by McDowell and a railroad employee who pulled him away from the window. Shortly thereafter, as the two patrolmen were leaving the scene of the tragedy, Bell complained of feeling ill and, because his condition grew progressively worse, McDowell took him directly to General Hospital in Louisville. A few hours later Bell suffered an occlusion as the result of a clot in the anterior descending branch of the left coronary artery; this is called coronary thrombosis by the medical profession. Death followed within several hours.

The $3,000 benefit was paid, but, upon appellee's refusal to pay the additional $12,-000 accidental death benefit when demand was made therefor, this action was brought by Bell's widow and beneficiary, Jadwiga Bell, and the members of the above pension board.

Appellee took the position below and contends here that Bell died of a coronary occlusion by reason of a diseased condition of his heart. Appellants have maintained throughout that disease did not cause, concur in or contribute to Bell's death, nor did the clot in his heart occur in the normal course of events, but that Bell's death was due to accidental injuries sustained in the course of his employment. At the conclusion of all the evidence each side moved for a peremptory instruction which was overruled. The lower court submitted the theory of each of the parties to the jury, which returned a verdict for the appellee.

Appellants now urge as grounds for reversal: (1) that the trial court erred in refusing to direct a verdict in their favor at the close of all the evidence; (2) that the court erred in giving the first and second instructions; (3) that the trial court should have given "Instruction No. I" and "Instruction No. II" offered by them; (4) that a certain part of appellants' evidence was improperly excluded; and (5) that the court coerced the jury into reaching a verdict. We shall consider these contentions in the order named.

The main difference between the parties lies in the interpretation of the medical testimony, which is rather voluminous and somewhat technical. Appellants introduced as physicians in their behalf Dr. George Dwyer, the coroner of Jefferson County, Dr. Paul Dent, a heart specialist, Dr. Samuel J. Brownstein, a retired physician who formerly examined police recruits, and Dr. John F. Breslin, the doctor who attended Bell in his last illness at the hospital. Appellee relied upon the expert testimony of Dr. Herbert L. Clay, a specialist in heart diseases, Dr. Patrick W. Cummings, a pathologist, and Dr. Harold W. Bradshaw, who performed an autopsy on Bell. These experts were in agreement as to the ultimate cause of Bell's death; that is, it was coronary occlusion. It would lengthen this opinion unduly should we detail the testi-

mony of each of these witnesses; therefore, we shall give a summary of the conclusions, pro and con, arrived at by these doctors, attempting to set forth the evidence on each side in the strongest possible light.

Appellants' medical testimony was to the effect that the severe burn Bell received on the back of his hand injured the blood vessels in that area to the extent that a clot originated there which later moved to and lodged in the coronary vessel. It was also their view that Bell's exertion in the building and his fright induced by his narrow escape from falling out the window of the rest room tended to produce an increase in his blood pressure and a constriction of his blood vessels which, together with the condition resulting from the burn, made the formation of a blood clot more likely in one of the coronary arteries. These witnesses were of the opinion that arteriosclerosis was not sufficiently advanced in Bell to have had any direct bearing upon his death. It was brought out that Bell had always enjoyed good health until the time of his death.

Appellee's experts testified that Bell's coronary occlusion did not arise from the burn he received on the back of his hand, for the reason that the clot would have been localized and could not have reached the heart because it would have been too large to pass through the capillary network lying between the heart and the site of the burn. Appellee's medical experts were of the unanimous opinion that the blood clot was produced by a disease known in medical terminology as arteriosclerosis, or what is commonly denominated hardening of the arteries. It was their belief that the death of Bell would have resulted from his diseased condition irrespective of the burn or Bell's experience at the window. They stated that arteriosclerosis could exist without symptoms and that one suffering from this condition could continue to be healthy and vigorous so long as no occlusion occurred.

■ The evidence introduced by the respective parties clearly presented an issue of fact as to the cause of Bell's death and we conclude the case was properly submitted to the jury for determination.

■ Turning our attention now to appellants' complaint as to the first and second instructions, we observe that the first instruction told the jury that if Bell died of a coronary occlusion resulting directly from accidental injuries sustained by him, the law was for the plaintiffs (appellants) and they should so find. Under the second instruction, the jury was told that if Bell died of a coronary occlusion resulting from any cause other than the accidental bodily injuries sustained by him, then the law was for the defendant (appellee) and they should so find. We are unable to find any error in these instructions. The court clearly submitted the two issues developed by the conflicting lines of testimony. The two instructions given have been approved by this Court where recovery must be based upon contractual terms similar to those contained in the policy in litigation. See Pyramid Life Ins. Co. v. Milner, 289 Ky. 249, 158 S.W.2d 429, 138 A.L.R. 1507; Metropolitan Life Ins. Co. v. Osborne, 286 Ky. 301, 150 S.W.2d 479; and Prudential Insurance Company v. Dudderer, 251 Ky. 627, 65 S.W.2d 745.

When all the evidence was in, appellants offered two instructions which were rejected. One of these, Instruction No. I, was tendered as a substitute for or supplemental to the first and second instructions of the court. This instruction, after embracing certain language covered by the instructions of the court, would have told the jury appellants were entitled to recover if death resulted from internal injuries revealed by the autopsy. Instruction No. II tendered by appellants would have required the jury to determine the character and degree of arteriosclerosis that must be present in Bell's body to preclude recovery on the policy sued on.

■ The first instruction the court submitted referred to the injuries sustained and did not require any visible proof thereof. Consequently, under this instruction the jury was free to consider whatever in-

juries they might believe Bell had received, regardless of whether the injuries were evidenced by a mark or contusion visible on the exterior of the body or were disclosed by the autopsy. Not only do we believe appellants' offered Instruction No. I is fully covered by the first instruction that was given but we also conclude that this instruction was perhaps more favorable to appellants than they were entitled to under the proof. As to appellants' tendered Instruction No. II, the issue was not raised, as we have indicated, that Bell's alleged accident concurred with Bell's arteriosclerotic condition to cause death. Appellee's position throughout has been that Bell's death would have occurred, and did in fact occur, despite the accident in controversy. For the reasons indicated, the court properly refused to give the two instructions proffered by appellants.

Appellants insist the trial court erred when it refused, upon appellee's objection, to permit a certain hypothetical question to be propounded to appellants' witness, Dr. Clay. The inquiry concerned an incident on the sixth floor of the office building in the rest room. Counsel for appellants included in the question the following words, "suppose he hit his chest there —." An objection was interposed and sustained at this point, and we think properly so, for there is no evidence in the record to indicate that deceased struck his chest against anything when he lost his balance. An examination of the avowal made by the witness reveals that it contained nothing material or even relevant to this case.

Appellants' next assignment of error concerns the court's action in sustaining objections of appellee to certain questions asked by appellants of one of appellee's medical experts, Dr. Cummings, appellants' purpose being to show bias upon the part of this witness. Without elaborating upon the type of evidence appellants were barred from eliciting, it is sufficient to merely state that no avowal was made and consequently there is no way to determine whether appellants were prejudiced by the ruling of the court.

Finally, appellants contend the court coerced the jury into reaching a verdict. After deliberating for nearly two hours, the jury returned to the courtroom and announced its inability to decide the case. The court then made the following comment:

"Under the circumstances, there is no alternative but to discharge you and reassign the case for a new trial, which means that a new jury will have to hear it and the whole case be tried over again, this, of course, is costly to the state, as well as the parties."

Thereupon several members of the jury asked for further time in which to deliberate. This request was granted, the jury retired and was able to bring in a verdict. Without deciding whether the remarks of the court were improper, we need only call attention to the point that no objection was made at any time to this procedure by counsel for appellants, nor was a motion ever made to discharge the jury before they announced their decision. The facts in Randolph v. Lampkin, 90 Ky. 551, 14 S.W. 538, 12 Ky.Law Rep. 517, relied upon as controlling in this instance, are so dissimilar to those in the case at bar as to make the principle of law in that opinion clearly inapplicable here. The jury was not directed to return for further deliberations as is argued; on the contrary, the course they followed was pursuant to their own request.

It is our opinion there are no errors in the record of this case that prejudiced appellants' substantial rights.

Wherefore, the judgment is affirmed.

CAMMACK, Justice.

I concur in the result reached because the jury was justified in finding that the plaintiff failed to prove that Bell died as a result of a bodily injury. I do not agree with the summation of the testimony of the company's paid medical witnesses. In my opinion, the testimony of one of those witnesses did not constitute even a scintilla of evidence.