STATE of Alaska, Appellant,

v.

David ARBUCKLE, Personal Representative of the Estate of Ronald C. Arbuckle, Deceased, Appellee.

Nos. S–7230.

Supreme Court of Alaska.

July 3, 1997.

Kathleen Strasbaugh, Assistant Attorney General, and Bruce M. Botelho, Attorney General, Juneau, for Appellant.

Joe P. Josephson, Josephson & Bair, Anchorage, for Appellee.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS, EASTAUGH and FABE, JJ.

## OPINION

RABINOWITZ, Justice.

## I. INTRODUCTION

The State of Alaska appeals from the superior court's grant of summary judgment in favor of David Arbuckle, the personal representative of the estate of Ronald C. Arbuckle (Arbuckle). The superior court ruled that the personal representative was entitled to recover $100,000 for the accidental death of Arbuckle, plus attorney's fees and costs.

## II. FACTS AND PROCEEDINGS

Arbuckle was an employee of the Department of Transportation and Public Facilities of the State of Alaska when he suffered a fatal heart attack. As a member of the Public Employees Local 71, AFL–CIO, Arbuckle was covered by a collective bargaining agreement that included the following travel insurance provision:

> The Employer shall insure the life of every employee against accidental death while in travel status away from their duty station in the amount of one hundred thousand dollars ($100,000) at no cost to the employee. The employee shall name the beneficiary.

The Travel Accident Exclusions section of the employee handbook provides in relevant part:

> [The accidental death] policy does not cover an individual for any loss caused by or resulting from ... either directly or indirectly from illness or disease or bacterial infection other than infection that occurs simultaneously with and because of an accidental act or wound....

On August 14, 1992, when he suffered the heart attack, Arbuckle was forty-nine years

old and working on travel status in Holy Cross, a village on the Yukon River. Arbuckle and a co-worker were in the process of dismantling and replacing overhead doors at a shop building located at the Holy Cross Airport. He had been working in Holy Cross for four days. That morning Arbuckle and a co-worker loaded their duffel bags, sleeping bags, cots, tool boxes, winding springs, and a 178–200 pound generator welder onto the back of a pickup truck. Arbuckle and two co-workers then drove to the Yukon River. Their task was to load the equipment onto a skiff, which was beached with its bow resting on the shore. The pickup was then backed as close to the skiff as possible. Arbuckle and a co-worker commenced unloading the pickup. They had not yet moved the generator when Arbuckle collapsed, falling to the ground next to the pickup. Arbuckle was immediately taken to a local health center a short distance away. A health worker administered CPR, but Arbuckle was declared "dead on arrival" shortly after 10:00 a.m.

According to Dr. William Breall, Arbuckle "would not have died at the exact point in time that he did die if he had not been doing the lifting that he was doing on August 14, 1992." Dr. Breall further stated:

I cannot say with reasonable medical certainty that [Arbuckle] would be alive today had he not been employed by his employer on August 14, 1992. What I can say is that he would not have died at that particular point in time. I can state with reasonable medical certainty that [had Arbuckle] remained in a non-physical mode, i.e., a resting mode, he would not have . . . died at that particular point in time. He could have died later that same day or the following day just walking up a flight of stairs. He could have died a few days later, just carrying his duffel bag to the airport. The reason I cannot say that he would be alive today is because he had an

extremely severe heart condition that was demonstrated by autopsy.

Dr. Breall found that Arbuckle had "severe atherosclerotic narrowing of his coronary arteries." One artery was totally occluded, and the other two major arteries were almost totally occluded, having "only a pinpoint opening or a pinpoint lumen through those arteries." Death resulted as Arbuckle "was doing a certain amount of work. This work resulted in an increased work of the heart muscle. . . . In this particular case, Mr. Arbuckle was unable to supply an adequate amount of oxygenated blood to the heart muscle." This led to his fatal heart attack. According to Dr. Breall,

[i]t makes no difference whether or not the items that Mr. Arbuckle was unloading from the truck at the time of his cardiac arrest were heavy or light. The mere activity of doing any type of minimal to mild lifting or unloading in a susceptible individual, where there is virtually no blood flow to the heart muscle, would be sufficient to result in a cardiac arrest and death.

The doctor opined that, considering the seriousness of Arbuckle's physical condition, "he would have dropped dead probably within hours or days after he did." [1] "Normal physical activities and normal emotionally stressful activities could have resulted in a cardiac arrest." The doctor stated that something such as "watching your favorite football team on television lose" could serve as an emotionally stressful situation.

Arbuckle had evidence of the heart disease as early as 1989. A physician, who he saw for a urinary complaint, ran tests which indicated "coronary artery atherosclerosis." Arbuckle was given Lovastatin to lower his cholesterol. The records indicated no advice regarding the condition, such as a limitation on work, being given. Arbuckle stopped taking Lovastatin on his own, as he felt well, in 1990.

1. Arbuckle, a smoker who generally "smoked between one and one-half to two packages of unfiltered cigarettes daily," may or may not have smoked the morning of his death. Dr. Breall termed smoking a factor that also caused "constriction of the coronary arteries."

In addition, Arbuckle "drank a lot of coffee" the morning of his death. Dr. Breall, however, stated that "the jury is still out with respect to whether or not coffee plays any major roll in people with this type of heart condition."

Shortly after Arbuckle's death, his union filed a grievance claiming accident insurance benefits on behalf of the family. The State rejected the claim, stating that "the death certificate indicates that [Arbuckle's] death was of natural causes." Arbuckle's son then filed a complaint in superior court, where he prevailed on summary judgment. This appeal then followed.

## III. STANDARD OF REVIEW

 This court will uphold summary judgment only if there are no genuine issues of material fact in the record and the moving party was entitled to judgment on the law. *Bishop v. Municipality of Anchorage*, 899 P.2d 149, 153 (Alaska 1995). When the court makes such a determination, all reasonable inferences must be drawn in favor of the non-moving party. *Id.* As to questions of law, this court applies its independent judgment and will adopt the rule that is most persuasive in light of precedent, reason, and policy. *Chizmar v. Mackie*, 896 P.2d 196, 200 (Alaska 1995).

 The interpretation of contract language is a question of law, subject to *de novo* review. *Cox v. Progressive Cas. Ins. Co.*, 869 P.2d 467, 468 n. 1 (Alaska 1994). Insurance contracts are interpreted "by looking to the language of the disputed policy provisions, the language of other provisions of the policy, and to relevant extrinsic evidence. In addition, we also refer to case law interpreting similar provisions." *Id.* (citations omitted).

## IV. DISCUSSION

 The State advances numerous arguments in support of its contention that the superior court erred in ruling that the bargained for travel accidental death and dismemberment insurance benefits extended to Arbuckle. We find it necessary to address only the State's claim that, since Arbuckle's death resulted from illness or disease and was excluded from coverage, the superior court should have granted summary judgment in the State's favor.[2]

As noted at the outset, the State, pursuant to its obligations under its collective bargaining agreement with Arbuckle's union, obtained travel accidental death and dismemberment insurance. The State obtained insurance which did not cover any loss resulting

> either directly or indirectly from illness or disease or bacterial infection other than infection that occurs simultaneously with and because of an accidental cut or wound. . . .

Given the record before the superior court, we conclude that it erred in granting summary judgment for Arbuckle and in not granting summary judgment in favor of the State. In our view the travel accident exclusion provisions quoted above control resolution of this appeal.[3]

In addition to the portions of the record set out previously, we note that Dr. Breall reached the following conclusions regarding the cause of Arbuckle's death:

> [Arbuckle] obviously suffered from severe and longstanding atherosclerotic occlusive disease of the coronary arteries. He had significant obstruction of his coronary arteries that was noted by treadmill testing in 1989. This atherosclerotic coronary artery occlusive disease was not the result of his work for the State of Alaska. This condition was secondary to a number of non-industrial risk factors. These risk factors included smoking, hypercholesterolemia, high levels of low density lipoprotein, the male gender, as well as the aging process.

**2.** The State's other points are as follows: To the extent the superior court relied on heavy lifting or extraordinary exertion as precipitating or causing Arbuckle's death, there is a dispute of a material fact precluding summary judgment. Additionally the State contends that it did not waive its right to assert its affirmative defenses.

**3.** We reach this conclusion fully cognizant of the well-established rule of interpretation that "in-surance coverage provisions should be broadly construed while exclusions are to be interpreted narrowly." *Whispering Creek Condominium Owner Ass'n v. Alaska Nat. Ins. Co.*, 774 P.2d 176, 178 (Alaska 1989); *Starry v. Horace Mann Ins. Co.*, 649 P.2d 937, 939 (Alaska 1982); *Hahn v. Alaska Title Guar. Co.*, 557 P.2d 143, 144–45 (Alaska 1976).

On the day of his death, [Arbuckle] had virtually total occlusive disease of all of his coronary arteries. He had very little blood flowing through his coronary arteries. There was very little oxygenated blood getting to his heart muscle.

The activity of unloading the pickup on the morning of August 14, 1992 was sufficient work activity to have caused an increased work of the heart. This increased work of the heart required additional oxygen beyond a resting oxygenated state. It was impossible to convey additional oxygen to the heart muscle at this time because of the marked atherosclerotic obstruction of all of the coronary arteries of [Arbuckle]. Because of this, he developed a cardiac arrhythmia, ventricular fibrillation. This cardiac arrhythmia led to a cardiac standstill and death.

The diagnosis section of the autopsy report concerning Arbuckle's death reads: "Cardiac arrhythmia secondary to coronary atherosclerosis." The Certificate of Death issued by Dr. Donald R. Rogers (certifier of cause of death) states that the final disease resulting in death was "Arteriosclerotic Heart Disease."

In our view, all of the evidence alluded to above conclusively demonstrates that Arbuckle's death was caused "either directly or indirectly from ... disease." Thus, this loss is excluded from coverage under the travel accidental death and dismemberment insurance obtained by the State pursuant to its collective bargaining agreement with Arbuckle's union. Our conclusion that the superior court erred in granting summary judgment to Arbuckle rather than to the State is in accord with numerous decisions which have interpreted accidental death insurance policies containing exclusionary clauses for losses resulting indirectly or directly from disease. *Rynerson v. National Cas. Co.*, 203 Mich.App. 562, 513 N.W.2d 436, 437–38 (1994), *appeal denied*, 447 Mich. 982, 525 N.W.2d 452 (1994) (finding no coverage where activity was ordinary even though death caused by cerebral hemorrhage after strain of fixing truck was unexpected); *Va-lente v. Equitable Life Assurance Soc'y*, 120 A.D.2d 934, 502 N.Y.S.2d 876, 877 (N.Y.App. Div.1986) (finding no coverage for death caused by heart attack resulting from ordinary physical exertion); *Spangenburg v. Aetna Life Ins. Co.*, 306 P.2d 707, 711–13 (Okla. 1957) (finding decedent who died from heart disease after strain caused by raising his arms in course of work not entitled to benefits where losses from disease are excluded). *See also Continental Cas. Co. v. Thompson*, 369 F.2d 157, 159 (9th Cir.1966); *Central Nat'l Life Ins. Co. v. Peterson*, 23 Ariz.App. 4, 529 P.2d 1213, 1217 (1975); *Carroll v. CUNA Mut. Ins. Soc'y*, 894 P.2d 746, 756 (Colo.1995); *Byck v. Commonwealth Life Ins. Co.*, 269 S.W.2d 214, 215–17 (Ky.1954); *Hebert v. Hughes Tool Co.*, 539 So.2d 789, 790, 792 (La.App.1989); *Tanner v. Life Ins. Co.*, 217 Va. 218, 227 S.E.2d 693, 694–95 (1976).

In granting summary judgment to Arbuckle, the superior court relied on *INA Life Insurance Co. v. Brundin*, 533 P.2d 236, (Alaska 1975), *Nationwide Mutual Insurance Co. v. Anglin*, 306 So.2d 147 (Fla.Dist. App.1975), and *Life Insurance Co. v. Evans*, 195 Mont. 242, 637 P.2d 806 (1981). Two of these decisions are distinguishable because, unlike the present case, they lacked an insurance provision excluding losses caused directly or indirectly by disease.

In *Brundin* this court ruled that an insured's heart attack during hemorrhoid surgery could come within the coverage of his accidental death insurance policy. In remanding for a new trial, we said:

> [W]e do not consider the policy language here broad enough to cover deaths which are unexpected but natural. This is an accident policy, not a life policy, and appellee never argued that she would recover under the policy if her husband would have suffered the cardiac arrest on the day it occurred no matter where he was or what he was doing. To recover, she must prove that the cardiac arrest was related to the surgery.[4]

*Brundin*, 533 P.2d at 243 n. 24. We reiterated the point, stating that appellant "need[ ]

---

**4.** The language of the policy in *Brundin* defined "bodily injury [as being] caused by an accident resulting directly and independently of all other causes." *Brundin*, 533 P.2d at 238.

only to demonstrate that the cardiac arrest was somehow related to the surgery, that is, that it would not have occurred on that day anyway in the normal course of events." *Id.* at 241. In *Anglin*, 306 So.2d at 148, the court suggested that the result would have differed if the policy had contained a clause excluding losses resulting directly or indirectly from disease or other bodily infirmity. More particularly, the Florida court said:

> If the policy also contain[ed] a provision excluding coverage where the death arises in part from disease or other bodily infirmity, the insurance company will be entitled to judgment as a matter of law whenever the undisputed facts show that disease materially contributed to the death.

*Id.* at 149. Compare *Evans,* 637 P.2d at 807–09, which involved an accidental injury not resulting from normal work duties or other normal activities. In *Evans,* the court permitted recovery under an accident policy with a disease exclusion when the insured, who had a pre-existing heart condition, died after a wolf bite triggered the heart attack. *Id.* 637 P.2d at 807.

5. Implicit in our holding reversing the superior court's grant of summary judgment is our rejection of Arbuckle's contention that the exclusionary clause for losses caused by disease contained in the State's employee handbook was not incorporated into the collective bargaining agreement. Again, the collective bargaining agreement specified that the State "shall insure the life of every employee against accidental death while in travel status away from their duty station...." Because this contract fails to specify the terms of the bargained for insurance, we look to relevant extrinsic evidence to interpret the contract with the goal of enforcing the parties' intent and reasonable expectations. *Municipality of Anchorage v. Gentile,* 922 p.2d 248, 255 (Alaska 1996). The parties' conduct after entering into a contract is probative of the intent behind the agreement. *Id.* at 259; *Peterson v. Wirum,* 625 P.2d 866, 870 n. 7 (Alaska 1981).

This court has previously held that a personnel policy manual may be incorporated into an employment contract. *Jones v. Central Peninsula General Hospital,* 779 P.2d 783, 787 (Alaska 1989). Whether an employee handbook was incorporated into an agreement is a question of fact to be determined in each case. *Id.* at 786.

In the present case, as the State persuasively argues,

## IV. *CONCLUSION*

 The superior court's entry of summary judgment in favor of Arbuckle is REVERSED and the case REMANDED to the superior court with directions to VACATE the summary judgment entered in favor of Arbuckle and to enter summary judgment for the State of Alaska.[5]

the employee handbook [is] a part of the contract because it describes a bargained-for benefit, accidental death insurance. The state was not required to provide any additional consideration. The union accepted the policy by failing to challenge it.... [Arbuckle] certainly assumed the policy was in force in his opening memorandum.

There is no reason to suppose that Local 71 and its members were unaware that the contracted for policy contained the exclusion outlined in the employee handbook, which [Arbuckle] attached to his motion for summary judgment.

Although the collective bargaining agreement did not explicitly permit the State to acquire insurance which excludes from coverage death resulting directly or indirectly from disease, we conclude that such an exclusion is within the parties' reasonable expectations. Local 71 contracted for insurance for "accidental death" of employees in travel status, not for general life insurance. A layperson would reasonably expect accidental death insurance to exclude from coverage death resulting directly or indirectly from disease.