INA LIFE INSURANCE COMPANY et al.,
Appellants,

v.

Luverne J. BRUNDIN, Appellee.

No. 2167.

Supreme Court of Alaska.

March 10, 1975.

Arden E. Page, Burr, Pease & Kurtz, Inc., Anchorage, for INA Life Insurance Co. and Insur. Co. of N. A.

Robert L. Richmond, Atkinson, Conway, Young, Bell & Gagnon, Inc., Anchorage, for Beneficial Standard Life Insur.

Marcus R. Clapp, Hughes, Thorsness, Lowe, Gantz & Clark, Anchorage, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER and FITZGERALD, JJ.

## OPINION

RABINOWITZ, Chief Justice.

This appeal arises from a superior court jury verdict rendered in favor of appellee LuVerne J. Brundin in a suit to recover benefits under several identical accidental death and dismemberment policies. Milton Brundin, appellee's husband, died following surgery for hemorrhoids in July 1972. During the surgery, Brundin's heart stopped without warning. The physicians in attendance managed to restore his heartbeat, but Brundin had lapsed into a coma from which he never recovered.

Shortly after the death, LuVerne Brundin filed claims as beneficiary under the policies at issue here. Appellants rejected the claims on the grounds that the death was not covered by the terms of the policies. Appellee then filed suit. After a trial and verdict in favor of appellee, appellants filed this appeal and appellee cross-appealed on the issue of the amount awarded to her as costs for expert witness fees.

At trial, appellee offered several expert witnesses to testify as to the facts surrounding Brundin's death and possible causes of his death. There was agreement that the immediate cause of death was a cardiac arrest. However, the expert witnesses could not arrive at a conclusion as to the exact cause of the cardiac arrest. Among the possible etiologies mentioned were acute myocardial infarction or arrhythmia; hypotension; anoxia secondary to position;[1] idiosyncratic reaction to the anesthesia; pulmonary embolism; dissecting aneurysm, and a sudden tearing of the aorta. Other unknown factors could also have been contributing causes.[2]

Further, it was established at trial that at the time of the operation Brundin was 58 years old, was 75 pounds overweight, had high blood pressure, may have been diabetic, drank several martinis a night and smoked a pack and a half of cigarettes a day. Testimony indicated that these factors could predispose a person to cardiovascular problems.

Appellants attempted to demonstrate that none of the experts testifying was able to connect the cardiac arrest and subsequent death with any particular causative incident within the surgical process. Appellee was content to elicit testimony that the cardiac arrest was somehow related to the surgery, although the exact mechanism of the cardiac arrest could not be determined with any certainty. It is from these conflicting approaches to the cause of Brundin's death that the major issues in this appeal arise.

Each of the policies at issue here[3] insures against death through bodily injury and defines "injury" as:

> bodily injury caused by an accident resulting directly and independently of all other causes in loss . . . . .

The primary issue in this appeal focuses on the superior court's interpretation of the coverage provided by this provision. In the instructions to the jury, the court defined "accident" as "an unexpected, unforeseen and abnormal occurrence". Appellants contend that this instruction could have led the jury to conclude that the cardiac arrest was the "accident" causing death. In appellants' view, the proper definition of "accident" would require a showing that a mistake or misstep occurred in the course of the operation, and that that misstep was the direct cause of the cardiac arrest. Thus, we must first determine the legal meaning of the policy language.

There are two main lines of authority interpreting insurance provisions like that quoted above. The cases relied upon by

---

1. Due to the nature of the surgery, the patient was placed on his stomach, a position made more uncomfortable by his obesity.

2. The possibility of a stroke was mentioned as well, although a partial autopsy of the brain revealed no evidence of damage which could be attributed to a stroke. A full autopsy of the body was never performed.

3. It was stipulated for purposes of the lawsuit that the basic insuring provisions were identical.

appellants construe such provisions strictly and emphasize the distinction between accidental results and accidental means.[4] These precedents would have required LuVerne Brundin to prove that the cause of the death was itself an accident, that is, that some actual mistake or misstep occurred during the surgery which caused the death. It would not be enough under this line of authority to prove that the result itself was accidental in the sense of being unexpected and unforeseen. As stated in 10 Couch on Insurance 2d section 41:112, at 142 (2d ed. R. Anderson 1962):

> [I]f an operation is not necessitated by an injury resulting from an accident, death occurring during or following the operation can be considered 'accidental' only when it is the result of mishap or misadventure in operative procedure.[5]

Under the court decisions relied on by appellants, the fact that the death was unexpected does not alone make it accidental.[6] For example, in Caldwell v. Travelers' Ins. Co., 305 Mo. 619, 267 S.W. 907 (1924), the court found no "accidental means" in a death following surgery for hernia repair. It noted that where the insured voluntarily undertook the surgery, it must be proven that something unforeseen or unusual occurred during the operation, and that the unforeseen or unusual occurrence caused the death.[7] Some cases hold that even if the result is not clearly foreseeable, death as the result of a voluntary undertaking is still not covered.[8] In the case at bar, appellants point out that there was no evidence presented here of any misstep or mistake in operative procedures relating to hemorrhoidectomy,[9] and that the insured undertook the surgery voluntarily, knowing that unexpected death can occur during surgery without any misstep in surgical procedures.

Appellee points to a growing number of jurisdictions [10] which have adopted a broader reading of policy language like that at issue here. This other main line of authority strives to apply the controlling policy language in a manner in which the average man would understand it.[11] An

---

4. Phrases such as "resulting from", "caused by", "sustained by", and "effected by" have generally been interpreted similarly because they have identical meanings for laymen. Pope v. Business Men's Assurance Co. of America, 235 Mo.App. 263, 131 S.W.2d 887 (1939); Federal Life Ins. Co. v. White, 23 S.W.2d 832 (Tex.Civ.App.1930). "Caused by an accident" is equivalent to "accidental means." Chelly v. Home Ins. Co., 285 A. 2d 810 (Del.Super.1971); National Life & Acc. Ins. Co. v. Knapp, 430 S.W.2d 84 (Tex. Civ.App.1968).

5. *See also* 1A J. Appleman, Insurance Law § 391 (1965); Annot., 166 A.L.R. 469 (1946); Annot., 35 A.L.R.2d 1105 (1952); Annot., 52 A.L.R.2d 1083 (1957); Greider & Beadles, Law and the Life Insurance Contract 206–10 (1968).

6. Hodges v. Mutual Health & Acc. Ass'n of Omaha, 15 Wash.2d 699, 131 P.2d 937 (1942).

7. *See also* McMahan v. Mutual Benefit Health & Acc. Ass'n, 33 Wash.2d 415, 206 P.2d 292 (1949); Pope v. Prudential Ins. Co., 29 F.2d 185 (6th Cir. 1928).
 Thus, there are holdings to the effect that if a course of action is undertaken voluntarily, with the expectation that a certain result is probable, that result is neither an accident nor occurs by accidental means; the result is presumed to be intended. Preferred Acc. Ins. Co. v. Clark, 144 F.2d 165 (10th Cir. 1944); Bernard v. Union Central Life Ins. Co., 117 F.Supp. 456 (D.Mass. 1954); Maryland Cas. Co. v. Spitz, 246 F. 817 (3d Cir. 1917); American Cas. Co. v. Gerald, 369 F.2d 829 (4th Cir. 1966).

8. California State Life Ins. Co. v. Fuqua, 40 Ariz. 148, 10 P.2d 958 (1932); Continental Cas. Co. v. Jackson, 400 F.2d 285 (8th Cir. 1968); Gulledge v. Atlantic Coast Life Ins. Co., 179 S.E.2d 605 (S.C.1971).

9. The operation was apparently performed as planned. The cardiac arrest occurred without warning just as the surgery was being completed.

10. See the list of cases at 10 Couch on Insurance 2d § 41:30 (2d ed. 1962). The trend appears to be in this direction. Greider & Beadles, Law and the Life Insurance Contract 210 (1968).

11. Lincoln Nat'l Life Ins. Co. v. Erickson, 42 F.2d 997 (8th Cir. 1930); Pilcher v. New York Life Ins. Co., 25 Cal.App.3d 717, 102 Cal.Rptr. 82 (1972); Tomaiuoli v. United States Fidelity & Guar. Co., 75 N.J. Super. 192, 182 A.2d 582 (1962).

early expression of the rationale behind this approach was expressed by Justice Cardozo in his dissent in Landress v. Phoenix Mutual Life Insurance Co., 291 U.S. 491, 54 S.Ct. 461, 78 L.Ed. 934 (1934). There Justice Cardozo said:

> The attempted distinction between accidental results and accidental means will plunge this branch of the law into a Serbonian Bog. 'Probably it is true to say that in the strictest sense and dealing with the region of physical nature there is no such thing as an accident.' . . . On the other hand, the average man is convinced that there is, and so certainly is the man who takes out a policy of accident insurance. It is his reading of the policy that is to be accepted as our guide, with the help of the established rule that ambiguities and uncertainties are to be resolved against the company.
>
> . . . . . .
>
> When a man has died in such a way that his death is spoken of as an accident, he has died because of an accident, and hence by accidental means. . . .
>
> . . . . . .
>
> If there was no accident in the means, there was none in the results, for the two are unseparable. . . . There was an accident throughout, or there was no accident at all.[12]

The cases comprising this second line of authority generally look to the reasonable understanding or expectations of the average person: if in common parlance an "accidental result" is an "accident", the accidental results should be covered. *See, e. g.*, Gaskins v. New York Life Insurance Co., 235 La. 461, 104 So.2d 171 (1958).[13]

An example of the reasoning behind this line of cases is found in Knight v. Metro-politan Life Insurance Co., 103 Ariz. 100, 104, 437 P.2d 416, 420 (1968):

> One paying the premium for a policy which insures against 'death by accidental means' intends to provide benefits to his family or named beneficiary in the event he should suffer death *caused by accident* as opposed to death caused by other means, such as suicide, murder, disease or natural death. . . .
>
> The term 'accidental means' as used in this policy should not be construed in a technical sense but should be given its ordinary and popular meaning according to common speech and usage and the understanding of the average man . . . . Insurance policies upon which the public relies for security in case of accident should be free from fine distinctions which few can understand until pointed out by lawyers and judges . . . . (citations omitted)

Similarly, the New York Court of Appeals approved of a jury instruction which defined "accidental means" as "those which produce effects which are not their natural and probable consequences".[14] The court said:

> Legal scholars have spent much effort in attempts to evolve a sound theory of causation and to explain the nature of an "accident". Philosophers and lexicographers have attempted definition with results which have been productive of immediate criticism. No doubt the average man would find himself at a loss if asked to formulate a written definition of the word. Certainly he would say that the term applied only to an unusual and extraordinary happening; that it must be the result of chance; that the cause must be unanticipated or, if known, the result must be unexpected. . . .

12. 291 U.S. at 499–501, 54 S.Ct. at 463, 78 L.Ed. at 938–39 (citations omitted).

13. The Pennsylvania Supreme Court has also recently changed to this standard. Beckham v. Travelers Ins. Co., 424 Pa. 107, 225 A.2d 532 (1967). *See also* Scott v. New Empire Ins. Co., 75 N.M. 81, 400 P.2d 953 (1965);

Knight v. Metropolitan Life Ins. Co., 75 N.M. 81, 437 P.2d 416 (1968); Gulf Life Ins. Co. v. Nash, 97 So.2d 4 (Fla.1957); Annot., 166 A.L.R. 469 (1947).

14. Burr v. Commercial Travelers Mut. Acc. Ass'n, 295 N.Y. 294, 301, 67 N.E.2d 248, 251 (1946).

. . . . . .

In this State there is no longer any distinction made between accidental death and death by accidental means, nor between accidental means and accidental results. As was said by Chief Judge Crane . . .: "Accidental death means death by accident, and excludes suicide; death occurring through 'accidental means' in this case and under these circumstances is the same as death occurring 'by means of an accident.'" . . . [A]ccidental means are those which produce effects which are not their natural and probable consequences. . . . [I]nsurance policies upon which the public relies for security in case of accident should be plainly written in understandable English "free from fine distinctions which few can understand until pointed out by lawyers and judges." A distinction between a "accidental means" and "accidental results" is certainly not understood by the average man and he is the one for whom the policy is written. . . . (citations omitted) [15]

Events similar to the instant case occurred in Whatcott v. Continental Casualty Co., 85 Utah 406, 39 P.2d 733 (1935), where a patient suffered a cardiac arrest and died during a routine appendectomy. The operation had been performed in the normal manner, without mishap. The court found that policy language requiring "an external, violent and purely accidental event" was met where the "accident" amounted to an unusual or unexpected result of an intentional act, though occurring without mischance, slip, or mishap. According to this theory of interpretation, LuVerne Brundin needed only to demonstrate that the cardiac arrest was somehow related to the surgery, that is, that it would not have occurred on that day anyway in the normal course of events. Appellee would not be required to prove that any actual misstep or mischance occurred during the operation.

In order to decide which line of authority to follow and therefore the extent of coverage in the instant case, we think it necessary to examine the principles which we have applied in past contract litigation, and particularly to insurance policy disputes. In our recent opinion in Day v. A & G Construction Co.,[16] we discussed the possible standards of interpretation which could be applied to a bilateral commercial contract. There we held that the proper standard was the reasonable expectations of the parties as to the meaning of the contract terms.[17] We also noted in *Day* that the interpretation of insurance contracts is controlled by somewhat different standards, due in part to the inequality in bargaining power and to the greater necessity for certainty required for ascertaining rates to be paid for policies. Further, in other cases we have concluded that ambiguities in the meaning of insurance contracts are to be resolved against the drafters of the language, the insurers.[18] And we have said than an insurance policy may be considered a contract of adhesion [19] and as such should be construed so as to provide the coverage which a layman would reasonably have expected, given his lay interpretation of the policy language.[20]

15. 67 N.E.2d at 251–52.

16. 528 P.2d 440 (Alaska 1974).

17. *Id.* at 444.

18. Pepsi Cola Bottling Co. v. New Hampshire Ins. Co., 407 P.2d 1009 (Alaska 1965). *See* Gillespie v. Travelers Ins. Co., 486 F.2d 281 (9th Cir. 1973).

19. Graham v. Rockman, 504 P.2d 1351 (Alaska 1972); Continental Ins. Co. v. Bussell, 498 P.2d 706 (Alaska 1972).

20. Graham v. Rockman, 504 P.2d 1351 (Alaska 1972); Continental Ins. Co. v. Bussell, 498 P.2d 706 (Alaska 1972); National Indem. Co. v. Flesher, 469 P.2d 360 (Alaska 1970). *See also* Tomaiuoli v. United States Fidelity & Guar. Co., 75 N.J.Super. 192, 182 A.2d 582 (1962); Linden Motor Freight Co. v. Travelers Ins. Co., 40 N.J. 511, 193 A.2d 217 (1963); Keeton, Insurance Law Rights at Variance with Policy Provisions, 83 Harv. L.Rev. 961 (1970).

A lay person's expectations of insurance coverage are of course formed by many factors besides the language of the policies themselves. Typically, a salesman explains the technical terminology to the prospective purchaser of insurance. Often, as in this case, purchase of insurance is induced by printed advertising flyers which describe the coverage.[21] It cannot realistically be said that the expectations of a purchaser of insurance are not generated in part by such representations. Moreover, it has frequently been held that an insurer is under a duty not to misrepresent the existence of coverage, either deliberately or negligently.[22] For this reason and in order to give effect to our rule of interpretation that a policyholder's reasonable expectations of coverage are to control, all representations of the insurer to the prospective purchaser must be taken into account. An insurer will in fact be bound by its representations to the extent that they form, with the policy itself, the expectations of a reasonable policyholder.

Applying these principles of Alaska contract law to the issue before us, we find that our law is generally compatible with the broader definition of "accident" urged by appellee. Thus, we conclude that the policy coverage at issue here is sufficiently broad to encompass accidents in the sense of accidental results, that is, instances when unintended injury or death results despite lack of any identifiable accidental causative agent. In our view, the language of the policies in question is inherently ambiguous, for "caused by an accident" is sufficiently close to "caused by accident" that we cannot say the average layman would necessarily understand accidental results to be excluded from coverage under the language in question.[23] Moreover, in the case at bar the prospective purchaser's expectations almost certainly were influenced by certain advertising flyers, which he obtained prior to purchasing the insurance, toward a broad interpretation of coverage. These flyers contained boldface and large-type statements such as the following: "EXTENT OF COVERAGE: Covers all accidents . . . ."; "Your coverage is all-risk. . . ."; "You are covered wherever and whenever an accident happens . . . ."; "[the policy] covers ANY ACCIDENTAL LOSS OF LIFE . . . ." In view of these representations which the deceased Milton Brundin was aware of and which were made without accompanying limiting language, we think a close construction of the language of the policies inappropriate. The language simply is not sufficiently unambiguous or prominent in restricting coverage that a layman would be disabused of the impression of broad coverage generated by the policy and the advertising flyers taken together. We hold that the policies' language here extends coverage to results and conditions which are unexpected and un-

---

21. In the instant case, the insured possessed a number of advertising flyers with invitations to purchase the insurance at issue here. The flyers were admitted into evidence as relevant to the insured's expectations of coverage.

22. *See, e. g.,* Harr v. Allstate Ins. Co., 255 A.2d 208 (N.J.1969) ; Dodge v. Aetna Cas. & Sur. Co., 127 Vt. 409, 250 A.2d 742 (1969) ; State Auto. Cas. Underwriters v. Ruotsalainen, 81 S.D. 472, 136 N.W.2d 884 (1965) ; Annot., 1 A.L.R.3d 1139 (1965). *See* Howarth v. Pfeifer, 443 P.2d 39 (Alaska 1968) ; Austin v. Fulton Ins. Co., 498 P.2d 702, 704–05 (Alaska 1972).

23. Webster's Third New International Dictionary, 1971, defines "accident" as "an event

or condition occurring by chance or arising from unknown or remote causes . . . lack of intention or necessity . . . an unexpected medical development . . . an unexpected happening causing loss or injury . . . ."

"An 'accident,' within the meaning of policies of accident insurance may be anything that begins to be, that happens, or that is a result which is not anticipated and is unforeseen and unexpected . . . ." 10 Couch on Insurance § 41:6 (2d ed. 1962).

*See also* comments on "accident" in Oil Base, Inc. v. Continental Cas. Co., 271 Cal. App.2d 378, 76 Cal.Rptr. 594, 600 (1969) ; Schneider v. Provident Life Ins. Co., 1 Am. Rep. 157 (Wis.1869).

foreseen and hence "accidental" in common usage.[24] We believe the result to be in harmony with this court's decisions involving construction of insurance contracts, as well as the rationale of the judicial precedents relied upon by appellee.[25] Moreover, we are not convinced that insurers are incapable of writing policy provisions whose limitations are clear to the layman, and then advertising them in a manner which does not mislead the purchaser.[26]

Appellants' next specification of error is that certain testimony by Dr. George S. Rhyneer, the cardiologist who was mainly responsible for Brundin's care from the date of the operation until his death a month later, was erroneously admitted. Testifying as an expert witness, Dr. Rhyneer admitted his own inability to pinpoint the exact cause of the cardiac arrest, but said that he was 90 percent to 95 percent sure it was related to the surgery. Appellants objected that this testimony was spec-

ulative, but it was admitted over their objection.

 Appellants correctly argue that the standard for admission of expert testimony in Alaska is whether the testimony would appreciably assist the trier of fact.[27] Under our decisions, we have said that an expert cannot be permitted merely to speculate. As to what constitutes speculation, we have elsewhere noted:

In Maddocks [Maddocks v. Bennett, 456 P.2d 453 (Alaska 1969)] this court was called upon to rule on the degree of certainty required in a medical expert's opinion, and held that a medical opinion based on 'reasonable probability' was sufficiently certain to have probative value and was properly admitted by the trial court. In concluding that the proferred opinion must be supported by probabilities rather. than mere possibilities, we adopted the test we have previously applied to govern the amount of medical proof required to sustain damage

24. Of course, we do not consider the policy language here broad enough to cover deaths which are unexpected but natural. This is an accident policy, not a life policy, and appellee never argued that she should recover under the policy if her husband would have suffered the cardiac arrest on the day it occurred no matter where he was and what he was doing. To recover she must prove that the cardiac arrest was related to the surgery.

It should also be apparent that when one undertakes an activity, such as certain types of surgery, in which there is a substantial chance that death or disability may occur, such a result, if it occurs, cannot properly be called accidental. If the activity is undertaken with full knowledge of a substantial risk, the resulting death or injury is not accidental, unless a positive mistake or misstep in fact occurred. In the instant case, the death occurred during a routine hemorrhoidectomy, in which the risk is ordinarily not substantial, so the insured cannot be said to have foreseen the result. Compare the cases cited *supra* at note 7.

25. In reaching this conclusion, we are influenced by the considerable semantic difficulties which courts have encountered in distinguishing between accidental "means" and accidental "results." As was noted in 166 A.L.R. 469, at 477:

This whole branch of insurance law has become shrouded in a semantic and polemical maze, and the result has been 'almost a wilderness of cases in which varying facts and situations have been applied in varying principles'. The situation is fast approaching a point where the slight flame of legal theory involved is being smothered. Some of the courts have felt it necessary to resort to tortuous and tortured legal jiu-jitsu to distinguish and differentiate between 'accidental means' and 'accident,' 'accidental injury,' etc. Accordingly, the courts of last resort in several jurisdictions have accepted and approved Mr. Justice Cardozo's views as expressed above as a common-sense approach to the legal theory involved.

We are also persuaded by the logic of Professor Keeton in his article, Insurance Law Rights At Variance With Policy Provisions, 83 Harv.L.Rev. 960 (1970), which advocates rejection of technical analysis of policy terms in favor of emphasizing the reasonable expectations of the policyholders.

26. For instance, the policies at issue here could have provided that deaths resulting from surgery shall not be covered unless it is established that there was a mistake or misstep occurring in the course of the operation which was the direct cause of death.

27. *See* Crawford v. Rogers, 406 P.2d 189, 192 (Alaska 1965).

awards. We chose that test in *Maddocks* because the medical testimony in question constituted plaintiff's entire case with regard to medical causation.[28] In the instant case Dr. Rhyneer's testimony was also critical to appellee's case in that most of the other experts were unable even to state whether the cardiac arrest was related to the surgery. The "reasonable probability" test thus is appropriate to apply to his testimony.

■ A reading of the record demonstrates that Dr. Rhyneer was speculating as to the exact cause of the cardiac arrest, and freely admitted he had no data on which to base an opinion. However, it does not follow that his conclusion that the cardiac arrest was related to the surgery was speculative. He appears to have based his opinion on both the statistical rarity of cardiac arrest, with the resulting improbability of the arrest occurring coincidentally with the surgery, and the fact that the range of possible causes of the arrest was mainly surgery-related. While he could not say which among these causes was the direct precipitating factor, his knowledge of the relation of each of the possible causes to the surgery rendered his opinion proper expert testimony and not mere speculation. We find no error in the admission of his testimony.

Appellants next assert that the exclusion of a portion of Dr. Fraser's testimony was prejudical error. Dr. James A. Fraser served as anesthesiologist during the operation. He testified through a videotape deposition offered by appellee. After he described the operation, he discussed several possible causes of the cardiac arrest, but admitted he really did not know what caused it. Appellee's counsel then questioned him as follows:

Q Doctor, at this time do you have any opinion in your own consideration of this matter, having reviewed the entire hospital record and everything else, as to what you believe to be the singular or multiple etiological factors that—Mr. Brundin's arrest?

A I dearly wish I had something to put my finger on, that would help me prevent ending up in the same circumstances again, what I didn't —do what? I can only assume that it was the culmination of these—a little overweight, a little diabetes, a little bit smoke, drink—not—certainly not an alcoholic, but drank more than some people do, and age, and so on. All summed up to make him a little bit more risky. He had been drawn a wrong—a bad card.

Q His life—his life expectancy as they existed at that time, do you feel—as far as you say, you can only surmise that might be it?

A Well, I guess that's what I said.

At trial appellee's counsel objected to the above passage as speculative. The objection was sustained, and appellants now question the exclusion of this testimony. It is clearly important testimony for appellants since Dr. Fraser seems to have been emphasizing non-surgery related factors, i. e., Brundin's prior physical condition which could have accounted for the cardiac arrest. Moreover, Dr. Fraser was the only witness who clearly theorized that the cardiac arrest was not related to the surgery.[29] Because this point was a crucial one for appellants, its exclusion cannot be held to have been harmless.

■ While the issue is not free from doubt, we hold that the response of Dr. Fraser was not speculative and therefore was erroneously excluded. · Further, the question was first propounded and then objected to by appellee's counsel. The general rule is that an interrogator cannot ob-

28. Davis v. Chism, 513 P.2d 475, 483 (Alaska 1973).

29. Another expert witness, Dr. Rodman Wilson, at one point testified that various possible causes of the cardiac arrest could have occurred in persons in the patient's condition outside of the operating room; but he also stated his belief that the cardiac arrest would not have occurred if the patient had not undergone the surgery.

ject to an answer to his own question except on grounds of non-responsiveness.[30] In this instance, the objection was grounded on the speculative nature of the response, not non-responsiveness. Moreover, we cannot say that the question, as framed, did not invite Dr. Fraser to respond, as he did, in terms of possibilities rather than scientific probabilities. The answer was responsive and for that reason alone should not have been excluded pursuant to appellee's objection.

■ An additional problem exists with the exclusion of Dr. Fraser's testimony. Earlier in the proceedings, appellee's counsel made certain statements about the videotape of Dr. Fraser's testimony running "straight through" which appear to have caused appellants' counsel to believe that the quoted passage would be shown and heard by the jury. As a result of appellee's subsequent objection, coming as it did near the end of the videotape, appellee's counsel was able to delete testimony which was favorable to appellants. Appellants contend that they would have objected to certain testimony of Dr. Fraser favorable to appellee except that they thought the questioned portion of Dr. Fraser's testimony which they considered favorable to their case would be received in evidence. While we doubt that any deliberate deception by appellee's counsel occurred, the result of the misunderstanding clearly was to exclude important testimony favorable to appellants. We therefore hold that the superior court erred in excluding this portion of Dr. Fraser's testimony and that review of the entire record shows that exclusion of this evidence cannot be characterized as harmless error in view of its importance to appellants' case.

Appellants also complain that the court's instructions were erroneous in several respects.[31]

■ At one point in his instructions to the jury, the trial court addressed the language in the policies requiring the injury to be caused by an "accident" and "resulting directly and independently of all other causes." More particularly, the instructions stated:

> [T]he court has determined as a matter of law that this terminology is descriptive of the requirement of proximate cause.
>
> The term 'proximate cause' means a cause which, in natural or probable sequence, produced the death complained of.
>
> If you find from the evidence that there were concurring causes of death, the cause to which the death is to be attributed is the dominant one, the one that sets the other causes in operation, and causes which are incidental are not the ones to which the death is to be attributed, even though they may be nearer in time and place to the death. That is, you must determine from the evidence which fatal injury or injuries occurred first in time. Any other injury or injuries, later in time, set in motion by the first injury, are not the dominant cause, even though they might have also caused the death.

Appellants contend that this instruction misstated the standard and applied a tort test of proximate cause rather than the stricter test contained in the language of the policies.

We disagree. Proximate cause is a familiar phrase to attorneys. But here it is addressed to laymen, who undoubtedly did not have fixed prior conceptions as to the meaning of proximate cause. They were not likely to apply the phrase except as it was defined by the court. Thus, if the court's definition of proximate cause ("a cause which in natural or probable sequence, produced the death complained of") and the limiting material which follows adequately instructed on what appel-

---

30. 3 Wigmore on Evidence § 785 (Chadbourn rev. 1970).

31. We have already dealt with appellants' contention that the definition of "accident" given in the instructions was erroneous.

lee had to show, there was no error in the use of the phrase.[32]

 As to the definition and accompanying language, we cannot say it was erroneous. The final paragraph above does limit the jury to finding the original causative factor and disregarding subsequent and incidental ones. Moreover, as a matter of law the policy language should not be taken as requiring a strict exclusion of all other possible contributing causes.[33] And at least one court has even used the phrase "proximate cause" to refer to nonexclusive causes:

> [T]he loss must be produced by 'external', by 'violent', and by 'accidental' means. Such means must be the proximate cause of the resulting death, but a total absence of latent contributing causes is not required for coverage to be afforded. Gaskins v. New York Life Ins. Co., [235 La. 461,] 104 So.2d 171 (1958).

A similar instruction utilizing the term "proximate cause" was approved in Burr v. Commercial Travelers Accident Insurance Co., 295 N.Y. 294, 67 N.E.2d 248 (1946).

Appellants also complain that the instructions erroneously submitted to the jury the question of what reasonable expectations of coverage under the policy were. The superior court in effect told the jury to interpret the policy language themselves. We find it unnecessary to address the question in view of the disposition we reach here. On retrial, the superior court should instruct the jury in accord with the interpretation of the policy language which we have placed upon it as a matter of law. More particularly, the superior court should instruct that the insured's death falls within the coverage of the policies if it was caused by the surgery and was unexpected or unforeseen.

In light of the foregoing, the case is reversed and remanded for a new trial.[34]

ERWIN, J., not participating.

---

32. Two aspects of the jury instructions, while not manifest error, are somewhat confusing and in our opinion should be modified upon retrial. The last two sentences in the instruction quoted above are proper in cases involving multiple injuries. Such is not the case here.

Secondly, the court's instruction on proximate cause would be clarified by more closely tying it to the policy language. For example, the first paragraph quoted above could begin, "As pertaining to the assertion that the death result 'directly and independ- ently of all other causes,' the court has determined, etc."

33. *See* 10 Couch on Insurance 2d § 41:48 (2d ed. R. Anderson 1962); Bosley v. Prudential Ins. Co. of America, 192 Okl. 304, 135 P.2d 479 (Okl.1943); Standard Acc. Ins. Co. v. Van Altena, 67 F.2d 836 (7th Cir. 1933).

34. In view of our decision, we do not reach the issues raised on cross-appeal regarding award of expert witness fees.