*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, e-mail corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| UNITED SERVICES AUTOMOBILE ASSOCIATION, | ) ) ) | |
| | ) | Supreme Court Nos. S-14580/14600 |
| Appellant and Cross-Appellee, | ) ) ) | Superior Court No. 1JU-09-00821 CI |
| v. | ) ) | O P I N I O N |
| MARY E. NEARY and PATRICK T. NEARY, individually, and on behalf of their deceased son, AIDAN NEARY, and CHARLES J. SCHNEIDER, II, and DAREEN PUHLICK, both individually and on behalf of their minor son, CHARLES J. SCHNEIDER, III, | ) ) ) ) ) ) ) ) | No. 6810 - August 16, 2013 |
| | ) | |
| Appellees and Cross-Appellants. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Juneau, David V. George, Judge.

Appearances: Marc G. Wilhelm and Paul W. Waggoner, Richmond & Quinn, Anchorage, for Appellant/Cross-Appellee United Services Automobile Association. Deborah A. Holbrook, Law Offices of Deborah A. Holbrook, Juneau, for Appellees/Cross-Appellants Neary. Daniel G. Bruce and Megan A. Wallace, Baxter Bruce & Sullivan P.C., Anchorage, for Appellees/Cross-Appellants Schneider and Puhlick.

Before: Fabe, Chief Justice, Stowers, Maassen, and Bolger, Justices. [Winfree, Justice, not participating.]

MAASSEN, Justice.

## I.    INTRODUCTION

Fifteen-year-old Kevin Michaud fired a single shot from a revolver belonging to his parents, killing one friend and seriously wounding another. The parents of the two victims sued Kevin, his parents, and their insurance company, United Services Automobile Association (USAA). The Michauds' liability policy provided a $300,000 limit for "Each Occurrence" of "Personal Liability." The superior court ruled that the policy afforded $900,000 of coverage because there had been a single occurrence and Kevin and his parents were each entitled to a separate per-occurrence policy limit. USAA appeals, arguing that the policy affords a single per-occurrence policy limit of $300,000 regardless of the number of insureds. The victims' parents also appeal; they contend that not only were there three individual coverage limits, one each for Kevin and his parents, but there were also multiple occurrences. We conclude that USAA's position is most in accord with the express language of the policy, the reasonable expectations of an insured, and case law, and we therefore reverse the superior court's decision.

## II.    FACTS AND PROCEEDINGS

On December 10, 2008, Kevin Michaud was visiting with some friends in his home after school. He took a revolver from his father's gun cabinet, handled it for awhile, then put a bullet in one chamber of the cylinder. He aimed the revolver at himself and pulled the trigger, then aimed at his friend, 14-year-old Aidan Neary, and pulled the trigger again. The gun fired on the second pull of the trigger. The shot passed

through Aidan's body, fatally wounding him, then struck 14-year-old Charles J. Schneider III (Chase) in the spine, where the bullet still remains.

Chase and his parents, Charles J. Schneider II and Dareen Puhlick, sued Kevin and his parents, Michael K. and Michele M. Michaud. They alleged several theories of liability, including negligence and negligent infliction of emotional distress (NIED). Aidan's estate and Aidan's parents, Mary E. and Patrick T. Neary, also sued the three Michauds on theories including negligence and NIED. The NIED claims were based on the emotional trauma the parents experienced upon witnessing the harm caused to their children. Both the Neary and the Schneider/Puhlick families also sued the Michauds' insurer, USAA, seeking a declaratory judgment as to USAA's liability under its policy. USAA counterclaimed for a declaratory judgment limiting coverage.[1]

For ease of reference we refer to the parents of Aidan and Chase as "the parents" and to Kevin's parents as "the Michauds."

The Declarations Page of the Michauds' insurance policy, under the heading "COVERAGES AND LIMITS OF LIABILITY," provides: "SECTION II. E. Personal Liability — Each Occurrence  $300,000." The definitions section of the policy defines the word "occurrence" as meaning "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:  a. bodily injury; or b. property damage."

---

[1]    The victims' parents also sued First Student, a transportation company that provided school bus services, alleging that it had acted negligently by dropping the victims off at a place other than their designated pick-up locations. First Student is not a party to this appeal.

Section II, Coverage E, to which the Declarations Page refers, describes more specifically the grant of coverage for "Personal Liability" and provides, in pertinent part:

> If a claim is made or a suit is brought against an insured for damages because of bodily injury or property damage caused by an occurrence to which this coverage applies, we will:
>
> 1. pay up to our limit of liability for the damages for which the insured is legally liable . . . .

Section II also contains several pages of "Conditions," two of which are relevant to our discussion here:

> **1. Limit of Liability.** Our total liability under Coverage E for all damages resulting from any one occurrence will not be more than the limit of liability for Coverage E as shown in the Declarations. This limit is the same regardless of the number of insureds, claims made or persons injured. All bodily injury and property damage resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of one occurrence.
>
> **2. Severability of Insurance.** This insurance applies separately to each insured. This condition will not increase our limit of liability for any one occurrence.

USAA moved for summary judgment in the superior court, arguing that it could be liable under its policy for no more than $300,000, a single per-occurrence policy limit, for all claims against its three insureds. The parents opposed the motion, arguing that there was a genuine issue of material fact as to the number of occurrences and thus as to the amount of USAA's possible liability. The Michauds opposed USAA's motion as well and cross-moved for summary judgment themselves, arguing that they

were each entitled to a separate coverage limit of $300,000 and that there were multiple occurrences.

The superior court held that (1) each of the three Michauds was entitled to a separate coverage limit of $300,000 per occurrence, and (2) there was one occurrence, meaning that the available limits under the policy were $900,000. USAA appeals the first ruling, arguing that the policy's per-occurrence limit of $300,000 does not vary depending on the number of insureds. The parents appeal the second ruling, arguing that the facts of this case gave rise to multiple occurrences: the bodily injury to the two shooting victims and the emotional distress suffered by the victims' four parents. They argue in the alternative that each negligent act or omission by Kevin and his parents that led up to the shooting was a separate occurrence.

## III.    STANDARD OF REVIEW

"We review the grant of a summary judgment motion de novo, affirming if the record presents no genuine issue of material fact and if the movant is entitled to judgment as a matter of law."[2]  In making this assessment, we draw all reasonable inferences in favor of the non-moving party.[3]  A superior court's interpretation of insurance policy language is a matter of law reviewed de novo.[4]  In this case, the victims' parents and USAA all moved for summary judgment. We will make all reasonable

---

[2]      *Beegan v. State, Dep't of Transp. & Pub. Facilities*, 195 P.3d 134, 138 (Alaska 2008) (citing *Matanuska Elec. Ass'n v. Chugach Elec. Ass'n*, 152 P.3d 460, 465 (Alaska 2007)).

[3]      *Id*. (citing *Matanuska Elec. Ass'n*, 152 P.3d at 465).

[4]      *State Farm Mut. Auto. Ins. Co. v. Dowdy*, 192 P.3d 994, 998 (Alaska 2008) (citing *Simmons v. Ins. Co. of N. Am.*, 17 P.3d 56, 59 (Alaska 2001)).

inferences in favor of the opposing party when evaluating each party's arguments in support of summary judgment.

## IV.   DISCUSSION

### A.   The Michauds' Liability Insurance Policy Provided A Single Per-Occurrence Limit Of $300,000.

When interpreting insurance policies, we look to the language of the disputed provisions, other provisions in the policy, extrinsic evidence, and case law interpreting similar provisions.[5] Insurance policies are construed in such a way as to honor the reasonable expectations of a layperson seeking coverage.[6] Ambiguities will be construed most favorably to the insured.[7] Policy language is ambiguous when it is susceptible to two or more reasonable interpretations.[8] Absent ambiguity, we will still rule in favor of coverage if that is the only way to effectuate the insureds' objectively reasonable expectations, even though "painstaking study of the policy provisions would have negated those expectations."[9]

The provisions at issue here regarding the limits of the Michauds' homeowners' policy are not ambiguous. The policy's Declarations page states that the "Personal Liability" limit of $300,000 applies to "Each Occurrence." Nothing on the

---

[5]   *Allstate Ins. Co. v. Teel*, 100 P.3d 2, 4 (Alaska 2004) (citing *Bering Strait Sch. Dist. v. RLI Ins. Co.*, 873 P.2d 1292, 1295 (Alaska 1994)).

[6]   *Dowdy*, 192 P.3d at 998 (citing *Allstate Ins. Co. v. Falgoust*, 160 P.3d 134, 138 (Alaska 2007)).

[7]   *Id*. (citing *Falgoust*, 160 P.3d at 138).

[8]   *Id*. (citing *Falgoust*, 160 P.3d at 138).

[9]   *Teel*, 100 P.3d at 4 (quoting *C.P. ex rel. M.L. v. Allstate Ins. Co.*, 996 P.2d 1216, 1222 (Alaska 2000)) (internal quotation marks omitted).

Declarations page suggests that this number will be increased depending on the number of insureds; indeed, such a construction is expressly prohibited by other language in the policy. Section II addresses the Michauds' "Liability Coverages." It commits USAA to "pay *up to [its] limit of liability* for the damages for which the insured is legally liable" for covered liability claims. (Emphasis added.) A portion of Section II labeled "Conditions" further explains what is meant by "Limit of Liability": "Our total liability under Coverage E for all damages resulting from any one occurrence will not be more than the limit of liability for Coverage E as shown in the Declarations." Adding further to the clarity, the provision then states, "This limit is the same regardless of the number of insureds, claims made or persons injured."

This unambiguous language plainly precludes the result the parents seek here: a multiplication of the limit of liability by "the number of insureds." We have found no case in which a court faced with the same policy language applied a separate per-occurrence policy limit to each insured, though courts have declined to do so. In a case involving an automobile policy, *Folkman v. Quamme,* the Supreme Court of Wisconsin rejected the argument that an "each occurrence" limit applied to each insured.[10] It observed that the liability provision at issue was not ambiguous — the insureds "must *add* the words 'for each insured' to the endorsement for it to acquire the meaning they offer" — and that under the insureds' analysis the insurer "could never be certain what its total liability would be," giving as an example an automobile accident in which a number of insureds in the same vehicle were arguably at fault.[11]

---

[10] 655 N.W.2d 857, 870-72 (Wis. 2003).

[11] *Id.* at 870-72 (emphasis in original). *See also Murbach v. Noel*, 798 N.E.2d 810, 812 (Ill. App. 2003) (holding that the limits of liability provisions in an automobile policy were unambiguous).

The parents argue that USAA's reading of the policy is contradicted, or at least made ambiguous, by three of the policy's provisions. First, they rely on the "Personal Liability" provision of the Liability Coverages section, arguing that the word "personal" implies that the coverage limit applies separately to each individual insured rather than to the insureds as a group. But the phrase "Personal Liability" simply describes the type of coverage that the liability section provides — for damages in tort for which an insured can be held personally liable;[12] it does not purport to expand that coverage or to define its dollar limits.

Second, the parents rely on the sentence in the coverage provision that commits USAA to "pay up to [its] limit of liability for the damages for which the insured is legally liable." The parents contend that this sentence, with its use of "the insured" in the singular, again implies that the full limit of liability is available for the damages assessed against each individual insured. We find this argument unconvincing given that the commitment to "pay" in this sentence is expressly qualified by the limit of liability, plainly stated elsewhere in the policy to be a single, per-occurrence limit.

Finally, the parents argue that the policy's severability clause supports their reading. Captioned "Severability of Insurance," the clause provides: "This insurance applies separately to each insured. *This condition will not increase our limit of liability for any one occurrence.*" (Emphasis added.) Severability clauses are generally interpreted to mean that a policy's exclusions and conditions apply separately to each insured;[13] for example, the activity of one insured that brings him within a policy

---

[12] In law generally, "personal liability" simply means "[l]iability for which one is personally accountable and for which a wronged party can seek satisfaction out of the wrongdoer's personal assets." BLACK'S LAW DICTIONARY 998 (9th ed. 2009).

[13] *See Marwell Constr., Inc. v. Underwriters at Lloyd's, London*, 465 P.2d

(continued...)

exclusion will not be imputed to other insureds when they seek coverage under the same policy.[14] Severability clauses are not coverage provisions; they do not increase policy limits.[15] The USAA policy makes this very clear by stipulating that the clause "will not

---

**13**　　(...continued)
298, 305 (Alaska 1970) (quoting *Shelby Mut. Ins. Co. v. Schuitema*, 183 So. 2d 571, 573 (Fla. Dist. App. 1966)); *Nat'l Ins. Underwriters v. Lexington Flying Club, Inc.*, 603 S.W.2d 490, 492 (Ky. App. 1979) ("The purpose of severability clauses is to spread protection, *to the limits of coverage*, among all of the named insureds." (emphasis added)). *See also C.P. ex rel. M.L.*, 996 P.2d at 1225 (noting trial court's recognition of the fact that the policy under review "contains no 'severability of interest' clause that would clearly limit the effect of an exclusion to the person claiming coverage"); *State, Dep't of Transp. & Pub. Facil. v. Houston Cas. Co.*, 797 P.2d 1200, 1205 (Alaska 1990) (Matthews, C.J., concurring) ("[I]n the absence of a severability of interests clause, an insurance policy is ambiguous as to whether or not the use of the term 'the insured' in an exclusion refers merely to the insured seeking coverage or to the insured seeking coverage and to the named insured.").

**14**　　We recognize that some exclusions are specifically worded such that their application to any insured excludes coverage for all insureds. Courts disagree on the effect of severability clauses in such circumstances, although "[t]he majority of courts hold . . . that the existence of a severability clause does not affect a clearly worded exclusion." *Argent v. Brady*, 901 A.2d 419, 423-28 (N.J. Super. App. Div. 2006) (collecting cases and holding that exclusion of coverage for liability resulting from the business pursuits of "any insured" excluded coverage for all insureds regardless of severability clause). We do not need to decide this issue here.

**15**　　*See, e.g., Am. Family Mut. Ins. Co. v. Bower*, 752 F. Supp. 2d 957,  963 (N.D. Ind. 2010) ("Severability clauses are commonly used to provide each insured with separate coverage, as if each were separately insured with a distinct policy, *subject of course to the policy's liability limits.*" (emphasis added)); *Baker v. DePew*, 860 S.W.2d 318, 320 (Mo. 1993) ("The severability clause applies to the meaning of the term 'insured' anywhere in the policy except in the provisions that specify the limits of liability; i.e., the severability clause does not operate to increase the limits of the policy."); *Argent*, 901 A.2d at 426-27 ("A severability clause . . . is designed solely to render the coverage actually provided by the insuring provisions of the policy applicable
(continued...)

increase our limit of liability for any one occurrence." The parents argue that this qualification can be read as capping each *individual insured's* coverage at $300,000 per occurrence regardless of the number of claims or injured persons. Such a reading, however, even if otherwise reasonable, would still require the insured to look elsewhere to determine the limit of liability, as the severability clause merely states that it "will not increase" that limit whatever it may be. As described above, the limit of liability is plainly stated in the policy to be a per-occurrence limit of $300,000 that does not vary "regardless of the number of insureds, claims made or persons injured." The severability clause, in short, cannot be read to supply a per-insured limit of liability that is not found elsewhere in the policy.

As for extrinsic evidence, the parents do not point to any that could support a finding that the Michauds, despite the plain language of their policy, reasonably expected separate, individual per-occurrence limits. We have looked in the past to such evidence as statements by the insurer's sales representatives and the insurer's printed flyers or brochures for an indication of the reasonable expectations of the insured seeking coverage.[16] No such evidence exists in this case. The Michauds asserted in their pleadings below that they never discussed the relevant coverage provisions with representatives of their insurance company and never developed any relevant expectations with regard to coverage. These assertions do not appear to have been

_____

[15]    (...continued)
to all insureds equally, *up to coverage limits*. The severability clause is not denominated a 'coverage provision,' and it would be unreasonable to find that it operated independently in that capacity to increase the insurance afforded under the insuring provisions of the policy . . . ." (emphasis added)).

[16]    *See INA Life Ins. Co. v. Brundin*, 533 P.2d 236, 242 (Alaska 1975).

disputed. We enforce the unambiguous policy language and hold that the policy's single per-occurrence limit applied regardless of the number of insureds.

**B.    There Was A Single Occurrence.**

The parties also disagree on the number of occurrences:  USAA claims there was one because there was a single gunshot, and the parents assert that there were at least six because there were six injured victims (the two children and their four parents).   The Michauds' insurance policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results . . . in . . . bodily injury."   The policy does not define "accident," but our case law defines the term as "anything that begins to be, that happens, or that is a result which is not anticipated and is unforeseen and unexpected."[17]   We conclude that there was a single "accident" in this case that "result[ed] . . . in . . . bodily injury" and therefore a single occurrence for purposes of the limits of liability.   This conclusion is consistent with our precedent interpreting similar policy language and with the reasonable expectations of an insured.

The parents present two separate theories in support of a finding of multiple occurrences.  First they argue that each act of negligence that enabled Kevin to shoot his friends should be counted as a separate occurrence; this would include not only his own negligent handling of the gun but also each negligent act of his parents in failing to secure their firearms and supervise their son's activities.  But under our case law it is the unforeseen event, not every act of negligence preceding it, that constitutes the accident or occurrence for purposes of insurance coverage.  In *Fejes v. Alaska Insurance Co.*, a contractor sought indemnity from his general liability insurer for damages caused by a

---

[17]    *See, e.g., Fejes v. Alaska Ins. Co.*, 984 P.2d 519, 523 (Alaska 1999) (quoting *Brundin*, 533 P.2d at 242 n.23) (internal quotation marks omitted).

subcontractor's negligent installation of a septic system.[18] The insurer argued that there had been no "occurrence" because the negligent installation was not an accident.[19] The contractor focused instead on the results, arguing that there was an "occurrence" when the septic system was destroyed.[20] We found that the contractor had the better of the argument and held that the accident was the unexpected failure of the system, not the negligent installation that preceded it.[21]

In *Makarka ex rel. Makarka v. Great American Insurance Co.*, a driver ran a red light and struck another car, killing three passengers and injuring two.[22] The victims and their survivors sued the mechanic who had earlier worked on the driver's brakes and allegedly failed to repair them.[23] The mechanic's insurer contended that there was no coverage because its policy had been cancelled before the driver ran the red light and killed the victims; the plaintiffs countered that coverage was triggered when the mechanic performed his negligent work, which was during the policy period.[24]

Noting that the policy at issue was an "occurrence" policy, we observed that "[s]uch policies provide coverage that is based on accidents or events that happen while

---

[18] *Id*. at 521.

[19] *Id*. at 523.

[20] *Id*.

[21] *Id*.

[22] 14 P.3d 964, 965 (Alaska 2000).

[23] *Id.* at 956-66.

[24] *Id.* at 967.

the policy is in force."[25]  We referred approvingly to a statement of the California Court of Appeal that "the time of the occurrence of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed, but the time when the complaining party was actually damaged."[26]  While this is sometimes referred to as a "general rule," we noted in *Makarka* that it is actually "a restatement of the terms of most occurrence-based liability insurance policies," which are "triggered by bodily injury or property damage for which legal damages are due."[27]  We concluded that "the proper moment to measure whether coverage is in force is the moment the person seeking damages was injured."[28]  The USAA policy at issue here, while worded somewhat differently than the policy at issue in *Makarka*, is also an occurrence-based policy that is triggered by injury occurring during the policy period; an "occurrence to which this coverage applies" is defined as "an accident . . . which results, during the policy period, in . . . bodily injury; or . . . property damage."  This language reflects the "general rule" noted above:  that "the time of the occurrence of an accident" is not the time of the negligent act, but the time the plaintiff was actually damaged.[29]

In accord is an insurance treatise we have cited before for its definition of the term "accident":[30]  "The word 'accident' implies a misfortune with concomitant

---

[25]     *Id.*

[26]     *Id.* (quoting *Remmer v. Glens Falls Indem. Co.*, 295 P.2d 19, 21 (Cal. App. 1956)).

[27]     *Id.*

[28]     *Id.*

[29]     *See id.* (quoting *Remmer*, 295 P.2d at 21).

[30]     *See, e.g.*, *C.P. ex rel. M.L. v. Allstate Ins. Co.*, 996 P.2d 1216, 1223 nn.41-
(continued...)

damage to a victim, and not the negligence which eventually results in that misfortune."[31] The rule was applied by the Florida Supreme Court in a gunshot case with similarities to this one. In *Koikos v. Travelers Insurance Co.*, two shooting victims sued the owner of a restaurant, Koikos, alleging a negligent failure of security.[32] The gunman had fired two bullets, each one hitting a different victim.[33] Although a single negligent omission was alleged on the part of the restaurant — the failure to maintain adequate security — the court ruled that there were two occurrences, one for each gunshot causing injury.[34] The court explained:

> It is the act that causes the damage, which is neither expected nor intended from the standpoint of the insured, that constitutes the "occurrence." The insured's alleged negligence is not the "occurrence"; the insured's alleged negligence is the basis upon which the insured is being sued by the injured party. . . .
>
> . . . The accident — the event that was neither expected nor intended from Koikos's standpoint — was the shooting incident and not Koikos's own failure to provide security. Although Koikos's alleged negligence in failing to provide security is the basis for which liability is sought to be imposed, it was the shooting that gave rise to the injuries that

---

[30] (...continued) 42 (Alaska 2000) (quoting LEE R. RUSS, COUCH ON INSURANCE § 126:26 (3d ed. 1999)); *INA Life Ins. Co. v. Brundin*, 533 P.2d 236, 242 n.23 (Alaska 1975) (quoting LEE R. RUSS, COUCH ON INSURANCE § 41:6 (2d ed. 1962)).

[31] LEE R. RUSS, COUCH ON INSURANCE § 126:26 (3d ed. rev. vol. 2008) (citations omitted).

[32] 849 So. 2d 263, 265 (Fla. 2003).

[33] *Id.*

[34] *Id.* at 271.

were neither expected nor intended from the insured's standpoint.[35]

Here, similarly, it was not the Michauds' alleged failure to secure their firearms, nor their alleged failure to supervise their son, that constituted the event that was " unforeseen and unexpected"[36] from their standpoint as insureds; rather, it was "the shooting that gave rise to the injuries" that was "unforeseen and unexpected" and therefore, from their perspective, was the accident. The analysis is the same as it was in *Koikos*, though the mathematics are different. Here there may have been multiple acts of negligence, but it was a single gunshot that caused the plaintiffs' damages. The single gunshot was the one occurrence for purposes of liability coverage.

The parents argue separately that there were six occurrences because there were six discrete injuries: the single bullet struck both Chase and Aidan, which in turn caused emotional distress to all four parents. The parents urge us to adopt what is sometimes called the "effects" test, under which the number of occurrences is determined by the number of injuries caused. This test, however, is inconsistent with the plain language of the USAA policy, which, as discussed above, states that the limit of liability "as shown in the Declarations . . . is the same regardless of the number of insureds, claims made or persons injured."

In any event, a majority of courts that have considered the effects test as a way to determine the number of occurrences have rejected it as unworkable for that purpose.[37] Courts have correctly observed that the test renders insurers' liability both

---

[35]     *Id.*

[36]     *See INA Life Ins. Co. v. Brundin*, 533 P.2d 236, 242 n.23 (Alaska 1975) (quoting Russ, *supra* n.30, § 41:6) (internal quotation marks omitted).

[37]     *See generally* Michael P. Sullivan, Annotation, *What Constitutes Single*
(continued...)

unpredictable and limitless, since any one event can cause many injuries to many people.[38] A negligently caused explosion, for example, can injure one person or kill a hundred; it can damage one home or devastate a city block. The insurer attempting to underwrite the risk posed by the many potential effects of a single negligent act has no way to estimate its exposure and responsibly calculate its premiums. In *Koikos*, the court rejected the effects test under facts similar to those here, holding that the proper measure of occurrences was the number of gunshots, not the number of victims.[39] We reject the effects test here as a basis for calculating the number of occurrences, and we therefore reject the parents' argument that this single gunshot constitutes as many as six different occurrences.

Finally, we believe that the rules we apply above conform to the reasonable expectations of an insured who is reading an occurrence-based policy like the one at issue here, in which "occurrence" is defined as an "accident" resulting in "bodily injury."

---

[37]  (...continued)
*Accident or Occurrence Within Liability Policy Limiting Insurer's Liability to a Specified Amount Per Accident or Insurance*, 64 A.L.R. 4TH 668, § 2[a] (1988). Courts sometimes use the effects test simply to determine *when* and *where* an accident occurred, using other tests — e.g., the "cause" test — to calculate the number of occurrences. *See, e.g.*, *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56, 61-63 (3d Cir. 1982).

[38]  *See, e.g.*, *Saint Paul-Mercury Indem. Co. v. Rutland*, 225 F.2d 689, 692 (5th Cir. 1955) (noting that the usual "system of computing rates" for liability insurance "is simply incompatible with the idea of virtually limitless liability depending solely upon the number of claimants").

[39]  *Koikos*, 849 So. 2d at 273. Justice Wells, dissenting in *Koikos,* questioned the wisdom of a formula that equates the number of occurrences with the number of shots fired, positing a hypothetical in which a gunman "used an automatic weapon and merely kept squeezing the trigger, injuring 100 people," an incident which he asserted should "plainly" constitute "but one occurrence." *Id.* at 274. We need not address the issue in this case, since a single gunshot caused all the injuries.

We consider it unlikely that the ordinary insured who hears of an accident in the home, in the workplace, or on the highway will mentally convert that single event into some other number of accidents depending on the number of negligent acts and omissions that led up to it, or on the number of persons who were injured as a result. There was a single accident in this case — the unforeseen and unexpected firing of the single gunshot that caused all of the plaintiffs' injuries — and therefore a single occurrence for purposes of liability coverage under the USAA policy.

## V. CONCLUSION

We REVERSE the superior court's summary judgment order and REMAND for proceedings consistent with this opinion.